## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY

AIM GROUP, LLC D/B/A REVE BODY
SCULPTING, and AMY LOUISE STONE,

CASE NO.:  3:25-CV-690-RGJ

        Plaintiffs,

vs.

BTL INDUSTRIES, INC., MMP CAPITAL
INC., DEXT CAPITAL, LLC, and QL TITLING
TRUST, LTD.,

        Defendants.

_____/

## COMPLAINT

Plaintiffs, AIM GROUP, LLC D/B/A REVE BODY SCULPTING and AMY LOUISE

STONE, by and through undersigned counsel, sues Defendants, BTL INDUSTRIES, INC., MMP

CAPITAL INC., DEXT CAPITAL, LLC, and QL TITLING TRUST, LTD., and alleges as follows:[1]

## NATURE OF THE ACTION

1.  This is a civil action for unfair and deceptive business practices, breach of contract,

breach of duty of good faith and fair dealing, unjust enrichment, antitrust violations, fraud,

declaratory relief, and conspiracy.

## JURISDICTION AND VENUE

2.  This Court has jurisdiction over the subject matter of this action pursuant to 28

_____

[1] Plaintiff Aim Group, LLC d/b/a Reve Body Sculpting is hereby referred to as "Reve Body
Sculpting." Plaintiff Amy Louise Stone is hereby referred to as "Ms. Stone." Reve Body Sculpting
and Ms. Stone are hereby collectively referred to as "Plaintiffs." Defendant BTL Industries, Inc. is
hereby referred to as "BTL." Defendant MMP Capital Inc. is hereby referred to as "MMP Capital."
Defendant Dext Capital, LLC. is hereby referred to as "Dext Capital." Defendant QL Titling Trust,
LTD. is hereby referred to as "QL Titling Trust." BTL, MMP Capital, Dext Capital, and QL Titling
Trust are hereby collectively referred to as "Defendants."

U.S.C. §§ 1331 and 1332. The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Jurisdiction over the state and common law claims is also appropriate under 28 U.S.C. § 1367(a), 1338(a) and (b) and principles of pendent jurisdiction.

3.      This Court has personal jurisdiction over Defendants and venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a). A substantial part of the events or omissions giving rise to the claims in this action occurred in this District and/or Defendants may be found in this District.

4.      The agreements between Plaintiffs and BTL that are the subject of this action require the jurisdiction of all disputes "arising out of, or relating to, this Agreement to a court in Boston, Massachusetts." A true and correct copy of the BTL Purchase Agreement is being filed contemporaneously hereto as Exhibit "A."

5.      However, the forum selection clause in the BTL purchase agreements is unconscionable for the following reasons: (1) the BTL agreements were procured by fraud and the forum selection clause itself was chosen by BTL to deceive the Plaintiffs as BTL knew it would prevent Plaintiffs from being able to seek certain remedies since they solicited Plaintiffs in Kentucky and not in Massachusetts; (2) the enforcement of the forum selection clause would be so gravely difficult and inconvenient that Plaintiffs would be deprived of their day in Court as all the conduct that occurred between BTL and Plaintiffs occurred in Kentucky, and the Plaintiffs are located in Kentucky; (3) the chosen law would deprive the Plaintiffs of a remedy because the Massachusetts Unfair and Deceptive Trade Practices Act requires that the conduct of the parties to have occurred substantially in Massachusetts; and (4) the forum selection clause contravenes Kentucky's strong public policy of protecting consumers from fraud in commercial relationships.

6.      Further, the MMP Capital Finance Agreement contains a forum selection clause for

New York, and the QL Titling Trust Finance Agreement contains a forum selection clause for Indiana.

7.    It would be unreasonable and unjust to require Plaintiffs to litigate their claims against QL Titling Trust and MMP Capital in a separate lawsuit as the events or omissions giving rise to the claims against QL Titling Trust and MMP Capital arise out of the same conduct, transaction, or occurrence as Plaintiffs' claims against BTL. Further, under information and belief, BTL acted as QL Titling Trust and MMP Capital's agents in the events or omissions giving rise to Plaintiffs' claims against QL Titling Trust and MMP Capital. Moreover, not all parties to this litigation have signed the underlying contracts, and therefore, the forum selection clauses should not be enforced due to the waste of judicial and party resources and the risk of inconsistent judgments.

## THE PARTIES

8.    Reve Body Sculpting is a limited liability company registered in the Commonwealth of Kentucky, with a principal place of business at 12238 Shelbyville Rd., Louisville, KY 40243, with members who are citizens of the Commonwealth of Kentucky.

9.    Ms. Stone is a Kentucky citizen doing business in Louisville, Kentucky.

10.    Defendant BTL is a corporation of the Commonwealth of Massachusetts, with a principal place of business at 362 Elm Street, Marlborough, MA 01752.

11.    Defendant MMP Capital is a corporation of the State of New York, with a principal place of business at 19 Engineers LN, Farmingdale, NY 11735.

12.    Defendant Dext Capital is a limited liability company of the State of Delaware, with a principal place of business at 4000 Kruse Way Place, Building 3, Suite 100, Lake Oswego, OR 97035, with members who are citizens of the State of Oregon.

13.     Defendant QL Titling Trust is a statutory trust of the State of Delaware, with a principal place of business at 9830 Bauer Drive, Carmel, IN 46280, with members who are citizens of the State of Oregon.

## **FACTUAL ALLEGATIONS**

14.     BTL is a privately owned developer and manufacturer of Emsculpt®, Emsculpt NEO® and Cellutone body-contouring and/or skin-tightening products.

15.     BTL's Emsculpt® utilizes its proprietary high intensity focused electromagnetic energy (HIFEM®), which introduced an entirely new category of muscle toning and muscle strengthening to the aesthetic industry. BTL's Emsculpt NEO® combines BTL's HIFEM® and radiofrequency technology to tone muscle and break down fat.

16.     BTL's Cellutone is a non-invasive cosmetic treatment designed to reduce the appearance of cellulite and improve skin texture and firmness by utilizing the energy of strong, targeted mechanical vibrations that improves oxygen supply and microcirculation to the skin.

17.     BTL engages in the sale of equipment such as Emsculpt NEO® and Cellutone, class II medical devices that may only be sold to medical professionals. BTL heavily solicited Ms. Stone, a non-medical professional, as a potential purchaser of the equipment as Ms. Stone has a well-established weight loss center in Louisville, Kentucky, Reve Body Sculpting.

18.     Under information and belief, BTL has conspired with financing companies, MMP Capital, Dext Capital, and QL Titling Trust to create an illusion that these unsophisticated business owners are investing in a program with minimal to no risk.

19.     BTL sells these business owners extremely expensive equipment promising great returns and a booming market knowing that in reality there is no market for services using BTL's equipment at BTL's required minimum advertised prices.

20.    BTL teams up with MMP Capital and QL Titling Trust to provide these business owners with boilerplate Equipment Finance Agreements implying that these business owners may only finance the equipment with MMP Capital or QL Titling Trust and making these business owners believe that the finance agreements were mandatory and not subject to negotiation. MMP Capital and QL Titling Trust then allow and encourage BTL to misrepresent the interest rates for the financing and allows BTL to lie to these business owners that their personal credit would not be affected by the equipment financing and no personal assets would be subject to the collection if a default occurred on the financing. These lies are made to further induce the business owners to purchase the BTL equipment and enter Equipment Finance Agreement. MMP Capital then immediately sells the debt to third parties without the knowledge of the business owners.

21.    On or about August 12, 2022, BTL's Meghan Austin approached Plaintiffs about purchasing BTL equipment.

22.    To induce Plaintiffs' purchase, BTL knowingly and intentionally misled and lied to Plaintiffs about the profitability and existence of a market to sell services with BTL's products at BTL's minimum advertised prices. During the August 12, 2022 meeting, BTL made the following misrepresentations to Plaintiffs to induce them to purchase their equipment that, under information and belief, are knowingly false statements:

   a.    Emsculpt® is selling so well and making customers good money;

   b.    Emsculpt NEO® is the holy grail and, like death and taxes, Emsculpt NEO® is a certainty in life;

   c.    Emsculpt® and/or Emsculpt NEO® purchases have an average payoff of four to five months;

   d.    Emsculpt® and/or Emsculpt NEO® is the number one requested service in all

aesthetic and wellness right now. It is the number one purchase piece of equipment right now in all of aesthetics. It is a very hot brand because patients are asking for it. So, from that direct-to-consumer level, people are hearing and reading and seeing about Emsculpt NEO®;

e.  It takes about 66 patients to pay this device off;

f.  It is the number one device in the industry;

g.  Providers servicing BTL equipment that are usually open Monday through Friday are so successful that they are now also open on Saturdays;

h.  Emsculpt® and/or Emsculpt NEO® is the number one device in the industry;

i.  Emsculpt® and/or Emsculpt NEO® brings in 51% more new patients to practices;

j.  If providers wait to purchase the equipment and provide services using BTL's equipment, those providers could be missing out on $50,000 to $60,000 per month in sales;

k.  BTL's equipment brings in money to providers all year round as it is not seasonal;

l.  Providers servicing customers with BTL equipment near Ms. Stone are making good money;

m.  Ms. Stone will make 2.5 times the investment on one system before needing to replace the applicators;

n.  BTL is very strict on pricing and where the devices will be placed to maintain the market at the minimum advertised price (MAP);

o.  The price of each piece of equipment will go up starting January 2023 by at least $50,000;

p.  Ms. Stone will be one of the few lucky ones to get access to these exclusive pieces

that will be gone in no time;

q.   The sales representatives get paid based upon the number of units they sell and not on the price the equipment is sold for;

r.   BTL is doing $30 million in marketing;

s.   BTL provides a bus tour that will bring Ms. Stone loads of customers; and

t.   The interest rate for the financing of the Emsculpt NEO® would be 6.8%.

23.     BTL, acting as an agent of MMP Capital, provided Plaintiffs with a boilerplate Equipment Finance Agreements that MMP Capital quickly assigns to third parties, such as Dext Capital. BTL also provided Plaintiffs with QL Titling Trust's boilerplate Equipment Finance Agreement. BTL advised Plaintiffs of the interest rate and the terms of the loan on behalf of MMP and QL Titling Trust. Further, these boilerplate Equipment Finance Agreements do not disclose or state an interest rate. The agents of MMP Capital and QL Titling Trust advised Plaintiffs that they could return the equipment if servicing BTL products does not work out with no penalty, that a default would not appear on personal credit, and that Ms. Stone was not pledging any future assets. Yet, unbeknownst to Plaintiffs, the Equipment Finance Agreements contain a personal guarantee and do not allow for the return of the equipment. These false statements were made purely to induce Plaintiffs to enter into the Equipment Financing Agreements with MMP and QL Titling Trust by giving Plaintiffs a false sense of security that there was no downside to making the investment to purchase the equipment.

24.     On August 12, 2022, as a result of fraudulent misrepresentations by employees of BTL in the sale of the equipment, Plaintiffs contracted with BTL to purchase the Emsculpt NEO® and Cellutone. A copy of the Emsculpt NEO® and Cellutone Purchase Contract is attached hereto as Exhibit "A." At the same time, Plaintiffs executed Equipment Finance Agreements in

connection with this equipment as it was understood by Plaintiffs that they could not purchase the BTL equipment without executing Equipment Finance Agreements with MMP Capital and QL Titling Trust. A copy of the Equipment Finance Agreement in connection with the Emsculpt NEO® is attached hereto as Exhibit "B." A copy of the Equipment Finance Agreement in connection with Cellutone is attached hereto as Exhibit "C."

25.    The total purchase price of all BTL equipment purchased by Plaintiffs is approximately $234,374.60.

26.    Once BTL sells someone equipment, they then assign a business development person to contact the purchaser who is really instructed by BTL to try and sell the purchaser additional BTL equipment rather than actually trying to help the provider get business.

27.    In addition to the cost of the equipment, Plaintiffs further invested approximately $200,000.00 in staffing, training, marketing, and business development to operate the new body sculpting business as sold to them by BTL's fraudulent misrepresentations.

28.    The Emsculpt NEO® and Cellutone agreements included a Retail Price Maintenance ("RPM") price restraint agreement with a minimum advertised price ("MAP") consumer pricing schedule. The RPM consumer retail price was $850.00 per Emsculpt NEO® treatment/session and, upon information and belief, is uniformly mandated and applied throughout all U.S. markets by BTL.

29.    The provider automatically becomes a party to the RPM agreement when it purchases the Emsculpt NEO® and other non-invasive body sculpting equipment from BTL. The BTL purchase agreement includes the following hidden RPM language:

**Minimum Advertised Pricing Policy.** If Customer participates in Emsculpt NEO® MAP (minimum advertised pricing of $850/ treatment) and Emsculpt MAP (minimum advertised pricing of $750/ treatment), BTL will offer the following benefits:

(1) include Customer in BTL's provider directory,
(2) 2nd and 3rd year warranty service coverage at no charge (annual value of $15,000) on the Emsculpt or Emsculpt NEO device (excluding consumable and replacement parts), and
(3) discount from list price for replacement applicators (Emsculpt applicators discounted from $30,000 to $10,000; Emsculpt NEO applicators discounted from $30,000 to $15,000).

BTL will provide Customer with a written notice for the first non-compliance with MAP, and a second infraction will result in loss of benefits. Examples of non-compliance to MAP policy include representing over the phone, promoting, or publishing:

· Treatments at a price below the MAP
· "Buy one, get one" offers
· Package offers averaging out to less than MAP
· Statements such as or similar to "we will beat any price" or "guaranteed lowest pricing anywhere"
· Participating in social coupons and discount sites

Any modification to the MAP policy must be in writing by BTL. BTL sales employees or independent contractors do not have the authority to modify or grant exceptions to this policy. BTL reserves the right to adjust the MAP at its sole discretion at any time. BTL may also designate promotional periods during which the policy terms change.

*See* Ex. A.

30.    BTL body sculpting equipment purchases (RPM and non-RPM governed equipment) may routinely exceed $500,000, often exceeding $1 million, including financing costs.

31.    The provider uses the equipment to provide body sculpting services to consumers. The RPM agreement governs the minimum retail price of the services the provider may advertise to consumers. In the case of the Emsculpt NEO®, the provider may not advertise below $850 per treatment session (with a BTL recommended 4-treatment minimum of $3,400). BTL maintains similar RPM agreements for other equipment it sells to providers.

32.    To operate the equipment, the provider must regularly purchase expensive consumables from BTL, a potential indirect royalty. If a provider violates the RPM agreement, BTL doubles the cost of the applicators needed to run the machine from $15,000 to $30,000 and removes the provider from the BTL online Provider List, making profitability with the equipment

highly unlikely. The previously stated coercions and other coercive penalties were invoked against Plaintiffs when Plaintiffs chose to advertise the treatment sessions for less than the required MAP forced upon them by BTL in 2023 because they were not able to get business at the required MAP. In addition, the consumable terms mislead BTL equipment buyers that providers may exit the RPM agreement and maintain the profitability of their investment.

33.    Providers seeking to sell BTL Emsculpt NEO® equipment and exit their investment must pay BTL an approximate $100,000 arbitrary recertification/transfer fee. The BTL agreement mentions the fee, but the amount is not specified, which is a material omission. The transfer fee makes reselling and exiting the equipment investment virtually impossible and misinforms the buyer regarding BTL assurance to police its market.

34.    As a result of the hidden RPM contractual provision, BTL maintains a perpetual security interest in the equipment to ensure the provider's performance of its obligations as BTL requires the recertification fee, will prevent the machine from working, doubles the cost of the applicators, and removes the provider from the BTL website. The security interest makes reselling and exiting the investment in the equipment virtually impossible, and it misinforms the buyer regarding BTL assurance to police its market.

35.    BTL includes coercive punishments for RPM violators and providers seeking to exit the RPM agreement that damages the provider's investment in RPM-governed and non-RPM-governed equipment investments.

36.    BTL requires a separate purchase agreement for each unique piece of equipment it sells to a provider.

37.    BTL used misleading and deceptive business investment language and equipment income presentations to induce the initial purchase of BTL equipment and subsequent equipment

purchases by Plaintiffs at BTL provider conferences where BTL upsells the business investment opportunity of using BTL equipment, thereby targeting Plaintiffs and providers to purchase additional (expensive) BTL equipment.

38.     BTL induced Plaintiffs by guaranteeing Plaintiffs that they would be making at least $50,000 a month and further pressuring Plaintiffs by stating that they would be losing out on this revenue if they did not begin investing in BTL right away. The earnings representations made by BTL were significant to Plaintiffs and fraudulently induced them into purchasing the equipment.

39.     BTL provided false and misleading information to Plaintiffs to make them believe that there was a market for the services provided by their machines when, in fact, BTL knew that no such market exists and that virtually none of their retailers were able to sell the services for the minimum-RPM of $850 per session or even $200 per session for that matter. Further, BTL significantly inflated the price of the machines based upon this false market that it created.

40.     Under information and belief, BTL has made similar misrepresentations to other purchasers to induce them to buy their equipment, and those other purchasers are unable to sell the services for the MAP required by BTL or even for much less.

41.     <u>Price Discrimination.</u> The BTL RPM is a vertical price-fixing system that favors body sculpting businesses with preexisting customer flows (before becoming a BTL provider), allowing such companies to sell the RPM-governed services below the MAP. At the same time, new market entrant BTL providers cannot advertise below $850 per session with the required 4-session minimum of $3,400. The BTL price restraint creates price discrimination with demonstrable cost of operations differentials between BTL providers, delivering favored providers, i.e., providers with preexisting customer flows, lower customer acquisition costs, and

improved operations margins, freeing them to spend more on advertising and marketing and offer other high- valued and more diverse service offerings. These advantages increase the profitability of favored BTL providers over non-favored BTL providers and effectively reduce competition among BTL vertical providers and horizontal competition as discriminated providers leave the market.

42.    <u>Consumables.</u> Instead of ceasing business with an RPM-violating provider, BTL increases the equipment consumable cost by 100%, thereby punishing the provider by directly increasing the provider's cost basis of operating the equipment. Increasing a provider's consumable costs is a coercive act designed to enforce the BTL price restraint provision; however, the price restraint renders the targeted provider unprofitable and destroys the provider's significant investment in BTL equipment, which may exceed $1 million. Many vertical BTL providers use competitor equipment to provide health and beauty services, including body sculpting, and compete horizontally with BTL providers and non-BTL providers. Unprofitable BTL providers leaving the market result in a less competitive horizontal market and shrinking consumer choice.

43.    <u>Transfer Fee.</u> Providers seeking to exit the RPM by selling their equipment must pay BTL a $100,000 recertification/transfer fee. The BTL agreement mentions the fee, but the amount is not specified, a material omission. The transfer fee is a coercive attempt to enforce the RPM by rendering the selling and exiting of the RPM-governed investment virtually impossible, causing the provider to suffer continued losses or incur a catastrophic loss. In addition, the transfer fee informs buyers that BTL will police its market to ensure RPM compliance and stop the emergence of a secondary equipment market that may undercut RPM-governed providers. However, BTL does not enforce this provision and has permitted a secondary equipment market to emerge. In addition, though BTL does not enforce the recertification/transfer fee, the

recertification/transfer fee deters providers from selling their BTL equipment and exiting their investment, which results in providers suffering continued and ongoing losses.

44.    <u>Coercive Non-Price Restraints.</u> BTL uses the aforementioned non-price restraints to punish RPM-offending providers and non-offending providers seeking to exit the RPM agreement. In addition, BTL extends its non-price coercion to non-RPM-governed equipment. In the event of an RPM violation or a provider exiting the RPM agreement, BTL coercively removes the provider entirely from BTL's national Provider List verification system, notwithstanding that the provider may own or have invested in non-RPM-governed BTL body sculpting equipment. The Provider List is an online service operated by BTL that allows consumers to validate a provider's ownership of BTL equipment (RPM and non-RPM-governed equipment) and select a BTL provider to provide the consumer's desired body sculpting services. BTL removes or delists a provider from the validation system for an RPM violation or simply exiting the RPM agreement, thereby rendering the provider invisible to consumers, notwithstanding the provider having invested in excess of $1 million in BTL RPM and non-RPM governed equipment. Delisting shuts the provider out of the body sculpting market and destroys its investment in RPM-governed and non-RPM governed equipment, reducing vertical and horizontal competition and consumer choice.

45.    <u>BTL's Perpetual Security Interest.</u> To ensure buyer compliance with all provisions of the agreement and RPM, the buyer grants BTL a perpetual security interest in the equipment to secure the "performance by the Customer of its liabilities and obligations." The perpetual security interest presents and informs buyers that BTL will police its market to ensure RPM compliance, impose recertification/transfer fees, and stop the emergence of a secondary equipment market that may undercut RPM-governed providers. BTL does not enforce this provision, as evidenced by the emergence of a secondary market for BTL equipment whereby buyers may purchase BTL

equipment at astronomical discounts; for example, 75% - 90% off the original equipment price is common in the secondary BTL equipment market. By not enforcing its security interest in the equipment and policing its market, BTL allows two distribution models to exist, whereby vertically price-restrained RPM providers to compete horizontally with secondary market non-price-restrained BTL equipment owners, where the cost basis and operational expense are a fraction of the RPM-governed providers. Such horizontal competition with identical but non-price-restrained BTL equipment owners reduces or destroys the profitability of price-restrained BTL providers, resulting in providers leaving the market, diminished horizontal competition and consumer choice, and increased consumer prices within the body sculpting market and related services. In addition, though BTL does not enforce the security interest, the security interest deters providers from selling their BTL equipment and exiting their investment, which results in providers suffering continued and ongoing losses.

46.    <u>Restricted Marketplace.</u> BTL coercions and RPM vertical price restraint result in providers losing the freedom to reject the RPM without suffering massive economic loss. The BTL RPM provision (i) precludes providers from freely acquiring other competitive goods to the price-fixed goods, (ii) precludes providers from selling off their equipment/inventory, (iii) generates a manufacturer (BTL) driven cartel where providers have no freedom to select another manufacturer or alternative consumable devices and services to deliver to consumers, (iv) misinforms the provider regarding expected revenue and equipment profitability, causing devastating harm to the provider and its ability to serve the market, and (v) advantages select providers through price and non-price restraints. Providers with existing body sculpting customer flows may sell RPM-governed services at a low, market-realistic price. In contrast, providers without existing body sculpting customers may only advertise for customers at the BTL governed $850/$3,400 minimum

14

package price for which there is little to no market. BTL is aware that their RPM regime results in a majority of their providers losing money on their BTL investment, with many going out of business and leaving the market.

47.     <u>Fraud.</u> BTL integrated a minimum price RPM into its sales process to purposefully and fraudulently induce potential customers (providers) into purchasing BTL Emsculpt NEO® equipment at inflated and unrealistic prices. Under information and belief, BTL knew there was little to no market for the services provided by the equipment; consequently, the vast majority of BTL providers lost their investment in RPM-governed equipment. The BTL sales process utilizes the stated RPM minimum advertised price ($850 per session/$3,400 4-session minimum) to (1) make an indirect earnings claim that misleads buyers regarding the business prospects of their BTL investment, (2) indicate and misinform buyers that a sufficiently large market exists for the Emsculpt NEO® equipment at the RPM-governed service price, and (3) indicate and misinform buyers that RPM service price is a luxury sale notwithstanding BTL flooding the market with its RPM-governed equipment without accompanying RPM pricing adjustments to account for the increased number of in- market providers all competing for the same customer base.

48.     <u>BTL Conferences.</u> After purchasing a BTL device, BTL invites the provider to attend BTL-sponsored conferences where BTL sells additional (costly) equipment to the provider. At these conferences, BTL removes all pretense regarding promoting its business opportunity. "Build Your Aesthetic Empire" conference headliners and BTL featured speakers, that are typically doctors paid by BTL, promoting the revenue opportunities available with further investment in BTL equipment was customary.

49.     <u>BTL Actively Screened Objective Questioning.</u> BTL prevented providers, including Plaintiffs, from attending BTL conferences with potentially damaging questions about

the BTL business sales process and the actual market size for RPM-governed services.

50.    BTL knowingly utilized its RPM vertical price restraint to obtain an unlawful objective, promote investment in costly body sculpting equipment and business:

   a.   as a disguised earnings claim to rationalize the purchase of overpriced equipment;

   b.   to mislead and misinform providers regarding the economic prospects for revenue and profitability of the proposed investment;

   c.   to falsely establish a market for the service of the equipment;

   d.   to inflate the market price for the service of the equipment;

   e.   to unlawfully coerce buyers to uphold the RPM;

   f.   to harmfully intervene in buyers' ability to perform due diligence; and

   g.   to promote the sale of an unregistered business opportunity.

51.    BTL knowingly set the RPM outside the known universe for its RPM- governed service for which no demonstrable market exists in the U.S., which resulted in catastrophic economic harm to Plaintiffs and other BTL equipment owners.

52.    BTL was aware that its RPM regime would not provide sufficient profitability to providers such that the provider may offer additional desirable services, including services that compete with BTL equipment services.

53.    BTL was aware that provider profitability was negatively impacted by its flooding the market with RPM-governed equipment.

54.    BTL attempted to secure adherence to its RPM by means that go beyond mere declination to sell to providers.

55.    BTL used price and non-price restraints to unlawfully coerce providers from exiting the RPM agreement, causing tremendous economic damage to providers.

56.     BTL used an undisclosed $100,000 recertification/transfer fee to unlawfully coerce acquiescence to the RPM agreement and otherwise coerce providers from selling off their investment in RPM-governed equipment, causing tremendous economic damage to providers.

57.     BTL used the RPM to unlawfully coerce providers to maintain participation in a money-losing BTL investment and service.

58.     BTL used the RPM to prevent providers from effectively communicating any price below the mandated minimum price to potential customers through both restraints on advertising and restraints on direct communication with customers.

59.     BTL knowingly included material omissions in its RPM agreement designed to mislead providers.

60.     BTL knowingly sold the same RPM-governed equipment to preexisting body sculpting businesses with large customer flows and to non-body sculpting businesses. As configured, the minimum advertised RPM delivered considerable market advantages to select providers while harming other providers.

61.     BTL knowingly generated an anticompetitive regime that inflates consumer service pricing and harms consumer availability amongst other vertical and horizontal competition.

62.     BTL knowingly generated an alternative, horizontal competitive distribution model unknown to providers that harmed RPM-governed providers and reduced market competition.

63.     BTL knowingly sold the equipment at a highly inflated price and rationalized the inflated price to potential buyers by fraudulently representing to the buyers that the MAP represented the market price that the equipment would bring to the buyer per session.

64.     BTL's actions, unfair and deceptive statements, and misrepresentations are false, misleading, defamatory, unfair and deceptive and were calculated to deceive, and as a result, they

17

have caused Plaintiffs to sustain serious injury and damages to its business reputation and operations.

## COUNT I – VIOLATION OF KRS 367.170
### (Against BTL)

65.     Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-64 as incorporated herein.

66.     At all relevant times, BTL was engaged in trade or commerce within the meaning of KRS 367.110(2).

67.     BTL's actions described above constitute unfair or deceptive acts or practices in the conduct of trade or commerce within the meaning of and in violation of KRS 367.170

68.     Further, BTL sold its equipment to Plaintiffs knowing that Plaintiffs were non-medical professionals, in violation of statutory and regulatory requirements.

69.     Under information and belief, BTL's actions described above have at all times relevant to this action been willful and/or knowing.

70.     As a direct and proximate result of BTL's actions alleged above, Plaintiffs have suffered monetary damages.

## COUNT II – VIOLATION OF KRS 367.175
### (Against BTL)

71.     Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-64 as incorporated herein.

72.     BTL manufactures and sells the body-contouring and/or skin tightening equipment. BTL is the only manufacturer of these particular types of machines as it holds the only patents on the specific type of technology used in these machines.

73.     BTL misrepresented to Plaintiffs that a market existed for the services provided by

the equipment they sold them at $850 per session or $750 per session depending on the piece of equipment being used. BTL made many fraudulent misrepresentations that induced Plaintiffs to purchase the equipment, which statements were used to make Plaintiffs believe that if they purchased the equipment, they would be able to pay for the equipment and sustain a business based upon selling the body contouring treatments/sessions at $850 per session or $750 per session.

74.     As a result, Plaintiffs and BTL entered into the Emsculpt NEO® and Cellutone Purchase Contract prohibiting Plaintiffs from advertising or communicating a price to any prospective purchaser for less than $850 per treatment session. After some time, it became clear that there was no market for this treatment at this required MAP.

75.     Unbeknownst to Plaintiffs at the time of purchase, BTL has contracted with other retailers for the same equipment at lower prices with lower MAPs and allows retailers who have an already substantiated business to sell the treatments sessions to existing customers for less than the MAP.

76.     Yet, BTL deemed Plaintiffs to be participating in the MAP by virtue of purchasing the equipment, and when Plaintiffs could not sell the body sculpting treatments at $850 per session, as there is no market for these treatments at such as price for new retailers trying to enter the market, and tried to sell them for a lower price, BTL embarked on a rampage of defamatory and punitive action against Plaintiffs.

77.     BTL's contracts with Plaintiffs, specifically its required minimum advertised price for the body sculpting treatments substantially lessened competition as it completely destroyed any possible competition in the market. It is an unreasonable restraint on trade.

78.     As a consequence of said conduct by BTL as aforesaid, Plaintiffs were injured in business or property as Plaintiffs' ability to successfully operate the equipment business sold by

BTL and was restrained and/or impaired because Plaintiffs are unable to compete in the marketplace and generate business, have been coerced and punished by BTL and have suffered and been damaged financially.

79.    Further, BTL is a monopoly distributor in this market, which is the market to provide treatment sessions through the use of its equipment. BTL's equipment uses patented technology that only BTL possesses and therefore, BTL is the sole distributor of this type of equipment.

80.    As a result of BTL's monopolization, it completely controls the prices that Plaintiffs and other providers are able to sell the treatment sessions for. BTL knows that the market does not support the MAP it includes in its contracts, and does so, to inflate the price BTL sells the equipment to retailers for. There is no market for these treatment sessions even at prices being offered in the secondary market, and therefore, no competition. As such, these actions by BTL are anticompetitive and Plaintiffs have been directly harmed because they are unable to enter the market as no such market exists.

81.    BTL's conduct as aforesaid is continuous in nature and has continued to the date hereof.

### COUNT V– VIOLATION OF ROBINSON-PATMAN ACT
#### (Against BTL)

82.    Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-64 as incorporated herein.

83.    To operate BTL's equipment, the provider must regularly purchase expensive consumables from BTL. If a provider violates the RPM agreement, BTL doubles the cost of consumables and removes the provider from the BTL online Provider List, making profitability with the equipment highly unlikely.

84.     Instead of ceasing business with an RPM-violating provider, BTL increases the equipment consumable cost by 100%, thereby punishing the provider by directly increasing the provider's cost basis of operating the equipment. Increasing a provider's consumable costs is a coercive act designed to enforce the BTL price restraint regime; however, the price restraint renders the targeted provider unprofitable and destroys the provider's significant investment in BTL equipment, which may exceed $1 million. Many vertical BTL providers use competitor equipment to provide health and beauty services, including body sculpting, and compete horizontally with BTL providers and non-BTL providers. Unprofitable BTL providers leaving the market result in a less competitive horizontal market and shrinking consumer choice.

85.     As a consequence of said conduct by BTL as aforesaid, Plaintiffs were injured in business or property as Plaintiffs' ability to successfully operate the equipment business sold by BTL and were restrained and/or impaired because Plaintiffs are unable to compete in the marketplace and generate business, have been coerced and punished by BTL and have suffered and been damaged financially.

86.     BTL's conduct as aforesaid is continuous in nature and has continued to the date hereof.

## COUNT VI – FRAUD
### (Against BTL)

87.     Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-64 as incorporated herein.

88.     BTL's actions, misrepresentations, failures to disclose and deceptive acts and actions as aforesaid are fraudulent and involve deception practiced in order to induce the Plaintiffs to act to their detriment and which caused that detrimental action in that: false representations of fact were made; BTL knew or should have known the representations were false or were made

with reckless disregard for their truth or falsity; the representations were made to induce action by the Plaintiffs; and that the Plaintiffs did act to their detriment and as a result sustained damages herein complained of; and/or BTL failed to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak, under circumstances in which there was a duty to speak in order to induce the Plaintiffs to act to their detriment.

### COUNT VII – UNJUST ENRICHMENT
**(Against BTL)**

89.     Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-64 as incorporated herein.

90.     As a result of BTL's actions as described above, BTL has been enriched at the expense of Plaintiffs as BTL has profited unfairly from the sale of the equipment where the services provided by the equipment have no real market.

91.     As a result of BTL's actions as described above, Plaintiffs have been deprived of a valuable benefit.

92.     BTL cannot establish any justification for their unjust enrichment at the expense of Plaintiffs.

93.     BTL's actions described above have at all times relevant to this action been willful and/or knowing.

### COUNT VIII– FRAUD
**(Against MMP Capital)**

94.     Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-64 as incorporated herein.

95.     On or about August 12, 2022, BTL, acting as an agent of MMP Capital, while on a telephone call with employees of MMP Capital, provided Plaintiffs with boilerplate Equipment

Finance Agreements that do not disclose or state the interest rate, which allowed MMP Capital to bait Plaintiffs into entering into the loan agreement with the promise of a false low interest rate knowing that Plaintiffs had no way to confirm the interest rate in the agreements.

96.     The agents and employees of MMP Capital advised Plaintiffs that they could return the equipment if the investment does not work out with no penalty.

97.     Further, agents of MMP Capital made the following misrepresentations:

    a.  Plaintiffs personal credit would not be affected by the equipment financing; and

    b.  No personal assets would be subject to the collection if a default occurred on the financing.

98.     Yet, the Equipment Finance Agreements require a personal guarantee and do not allow for the return of the equipment in lieu of payment.

99.     MMP Capital's actions, misrepresentations, failures to disclose and deceptive acts and actions as aforesaid are fraudulent and involve deception practiced in order to induce the Plaintiffs to act to their detriment and which caused that detrimental action in that: false representations of fact were made; MMP Capital knew or should have known the representations were false or were made with reckless disregard for their truth or falsity; the representations were made to induce action by the Plaintiffs; and that the Plaintiffs did act to their detriment and as a result sustained damages herein complained of; and/or MMP Capital failed to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak, under circumstances in which there was a duty to speak in order to induce the Plaintiffs to act to their detriment.

### COUNT IX – VIOLATION OF N.Y. GEN. BUS. LAW § 349
### (Against MMP Capital)

100.    Plaintiffs repeat and reallege each and every allegation set forth above in

paragraphs 1-64 as incorporated herein.

101.    At all times material, MMP Capital has conducted business, trade, or commerce in New York by financing equipment for consumers like Plaintiffs.

102.    MMP Capital's failure to disclose or state an interest rate in their boilerplate Equipment Finance Agreements poses a substantial risk to the safety of the public.

103.    MMP Capital engaged in bait and switch tactics when it lied and made material misrepresentations regarding the interest rate for the purchase of the equipment and advised Plaintiffs that they could return the equipment if servicing BTL products does not work out with no penalty.

104.    As a result, Plaintiffs have been injured.

### COUNT X - VIOLATION OF KRS 367.170
### (Against MMP Capital)

105.    Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-64 as incorporated herein.

106.    At all relevant times, MMP Capital was engaged in trade or commerce within the meaning of KRS 367.110(2) by financing equipment for consumers like Plaintiffs.

107.    MMP Capital's actions described above constitute unfair or deceptive acts or practices in the conduct of trade or commerce within the meaning of and in violation of KRS 367.170.

108.    Under information and belief, MMP Capital's actions described above have at all times relevant to this action been willful and/or knowing.

109.    As a direct and proximate result of MMP Capital's actions alleged above, Plaintiffs have suffered monetary damages.

## COUNT XII – CONSPIRACY
### (Against BTL, MMP Capital, and QL Titling Trust)

110.    Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-64 as incorporated herein.

111.    BTL, MMP Capital, and QL Titling Trust agreed to induce unsophisticated business owners to purchase BTL equipment and create an illusion that these unsophisticated business owners are investing in a program with minimal to no risk.

112.    BTL intentionally targets and solicits business owners that are unsophisticated in the industry of body contouring and skin tightening, like Plaintiffs, so that they are unfamiliar with the market and what price the treatment sessions for its products bring in the market, and they have no way of confirming.

113.    MMP Capital and QL Titling Trust provides BTL with boilerplate Equipment Finance Agreements that do not disclose an interest rate.

114.    MMP Capital and QL Titling Trust instructs or allows its agents to lie to and intentionally mislead these unsophisticated business owners to further create an illusion of minimal risk by advising these business owners that the Equipment Finance Agreements do not affect their personal credit and allow for the return of the BTL equipment for no penalty, when, in fact, the Equipment Finance Agreements require a personal guarantee.

115.    As a direct result of Defendants' conspiracy, Plaintiffs have been damaged.

## COUNT XIII – NEGLIGENT MISREPRESENTATION
### (Against BTL)

116.    Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-64 as incorporated herein.

117.    On or about August 12, 2022, BTL made several misrepresentations of material

facts to Plaintiffs regarding the marketability and profitability of its equipment.

118.    At the time BTL made these representations to Plaintiffs, BTL should have known these representations were false.

119.    BTL made these representations to Plaintiffs with the intent to induce Plaintiffs to rely on the representations and to induce Plaintiffs to purchase the BTL equipment.

120.    Plaintiffs justifiably relied upon these misrepresentations.

121.    As a direct result, Plaintiffs have been injured.

## COUNT XIV – NEGLIGENT MISREPRESENTATION
### (Against MMP Capital)

122.    Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-64 as incorporated herein.

123.    On or about August 12, 2022, MMP Capital and/or its agents made several misrepresentations of material facts to Plaintiffs regarding the Equipment Finance Agreement.

124.    For example, MMP Capital and/or its agents represented to Plaintiffs that the Equipment Finance Agreement would not affect Ms. Stone's personal debt and that if servicing BTL equipment did not work out, Plaintiffs could return to the equipment with no penalty.

125.    At the time MMP Capital made these representations to Plaintiffs, MMP Capital should have known these representations were false.

126.    MMP Capital made these representations to Plaintiffs with the intent to induce Plaintiffs to rely on the representations and to induce Plaintiffs to purchase BTL equipment and execute the Equipment Finance Agreement.

127.    Plaintiffs justifiably relied upon these misrepresentations.

128.    As a direct result, Plaintiffs have been injured.

## COUNT XIV – NEGLIGENT MISREPRESENTATION
### (Against QL Titling Trust)

129.    Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-64 as incorporated herein.

130.    On or about August 12, 2022, QL Titling Trust and/or its agents made several misrepresentations of material facts to Plaintiffs regarding the Equipment Finance Agreement.

131.    For example, QL Titling Trust and/or its agents represented to Plaintiffs that the Equipment Finance Agreement would not affect Ms. Stone's personal debt and that if servicing BTL equipment did not work out, Plaintiffs could return to the equipment with no penalty.

132.    At the time QL Titling Trust made these representations to Plaintiffs, QL Titling Trust should have known these representations were false.

133.    QL Titling Trust made these representations to Plaintiffs with the intent to induce Plaintiffs to rely on the representations and to induce Plaintiffs to purchase BTL equipment and execute the Equipment Finance Agreement.

134.    Plaintiffs justifiably relied upon these misrepresentations.

135.    As a direct result, Plaintiffs have been injured.

## COUNT XV – DECLARATORY RELIEF
### (Against Dext Capital)

136.    Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-64 as incorporated herein.

137.    Plaintiffs herein request a declaratory judgment from the Court that MMP Capital's assignment of the Equipment Finance Agreements to Dext Capital are invalid as the Equipment Finance Agreements were procured by MMP Capital's fraudulent actions as alleged above.

138.    There is a bona fide dispute between Plaintiffs and Dext Capital which creates an actual and present need for declaration from the Court.

139.    Pursuant to KRS 418.040, Plaintiffs petition the Court to issue a declaratory judgment as to the present and ascertainable issue of whether the assignments of the Equipment Finance Agreements are invalid.

140.    Plaintiffs have an actual, present, adverse, and antagonistic interest in the subject matter.

141.    The relief sought is not just requesting the giving of legal advice or the answer to questions propounded out of curiosity.

### COUNT XVI – VIOLATION OF THE SHERMAN ACT
**(Against BTL)**

142.    Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-64 as incorporated herein.

143.    BTL manufactures and sells the body-contouring and/or skin tightening equipment. BTL is the only manufacturer of these particular types of machines as it holds the only patents on the specific type of technology used in these machines.

144.    BTL misrepresented to Plaintiffs that a market existed for the services provided by the equipment they sold him at $850 per session or $750 per session depending on the piece of equipment being used. BTL made many fraudulent misrepresentations that induced Plaintiffs to purchase the equipment, which statements were used to make Plaintiffs believe that if they purchased the equipment, they would be able to pay for the equipment and sustain a business based upon selling the body contouring treatments/sessions at $850 per session or $750 per session.

145.    As a result, Plaintiffs and BTL entered into the Emsculpt NEO® and Cellutone Purchase Contract prohibiting Plaintiffs from advertising or communicating a price to any

prospective purchaser for less than $850 per treatment session. After some time, it became clear that there was no market for this treatment at this required MAP.

146.   Unbeknownst to Plaintiffs at the time of purchase, BTL has contracted with other retailers for the same equipment at lower prices with lower MAPs and allows retailers who have an already substantiated business to sell the treatments sessions to existing customers for less than the MAP.

147.   Yet, BTL deemed Plaintiffs to be participating in the MAP by virtue of purchasing the equipment, and when Plaintiffs could not sell the body sculpting treatments at $850 per session, as there is no market for these treatments at such as price for new retailers trying to enter the market, and tried to sell them for a lower price, BTL embarked on a rampage of defamatory and punitive action against Plaintiffs.

148.   BTL's contracts with Plaintiffs, specifically its required minimum advertised price for the body sculpting treatments, substantially lessened competition as it completely destroyed any possible competition in the market. It is an unreasonable restraint on trade.

149.   As a consequence of said conduct by BTL as aforesaid, Plaintiffs were injured in business or property as Plaintiffs' ability to successfully operate the equipment business sold by BTL and were restrained and/or impaired because Plaintiffs are unable to compete in the marketplace and generate business, have been coerced and punished by BTL and have suffered and been damaged financially.

150.   Further, BTL is a monopoly distributor in this market, which is the market to provide treatment sessions through the use of its equipment. BTL's equipment uses patented technology that only BTL possesses and therefore, BTL is the sole distributor of this type of equipment.

151.    As a result of BTL's monopolization, it completely controls the prices that Plaintiffs and other providers are able to sell the treatment sessions for. BTL knows that the market does not support the MAP it includes in its contracts, and does so, to inflate the price BTL sells the equipment to retailers for. There is no market for these treatment sessions even at prices being offered in the secondary market, and therefore, no competition. As such, these actions by BTL are anticompetitive and Plaintiffs have been directly harmed because it is unable to enter the market as no such market exists.

152.    BTL's conduct as aforesaid is continuous in nature and has continued to the date hereof.

## COUNT XVII – DECLARATORY RELIEF
### (Against BTL)

153.    Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-64 as incorporated herein.

154.    Plaintiffs herein request a declaratory judgment from the Court that the Emsculpt NEO® and Cellutone Purchase Contract is invalid and unenforceable as it was illegal for BTL to sell the BTL equipment to Plaintiffs.

155.    At all times material, BTL knew that neither Ms. Stone nor anyone at Reve Body Sculpting were physicians or licensed practitioners.

156.    The BTL equipment are class II medical devices that may only be sold to medical professionals. *See* FDA Classification Letter, attached hereto as Exhibit D. This is further admitted by BTL on its website, which states that "BTL devices should only be used under the continued supervision of a physician or licensed practitioner." *See* BTL's website at hhttps://bodbybybtl.com. A copy of the website's homepage is attached hereto as Exhibit E.

157.    There is a bona fide dispute between Plaintiffs and BTL which creates an actual

and present need for declaration from the Court.

158.     Pursuant to KRS 418.040, Plaintiffs petition the Court to issue a declaratory judgment as to the present and ascertainable issue of whether the Emsculpt NEO® and Cellutone Purchase Contract is invalid and unenforceable

159.     Plaintiffs have an actual, present, adverse, and antagonistic interest in the subject matter.

160.     The relief sought is not just requesting the giving of legal advice or the answer to questions propounded out of curiosity.

## **REQUEST FOR RELIEF**

WHEREFORE, the Plaintiffs request that this Court enter judgment in their favor on each and every claim for relief set forth above and award relief, including but not limited to the following:

a.  Compensatory damages;

b.  Consequential damages;

c.  Treble damages;

d.  Attorney fees;

e.  Pre and post-judgment interest; and

f.  Any other relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury on all issues so triable by right.


Dated October 23, 2025


/s/ *Lori W. Azzara*
**LORI W. AZZARA, ESQ**
**KY I.D. #96920**
COHEN SEGLIAS PALLAS GREENHALL & FURMAN P.C.
626 Washington Place, Suite 1902
Pittsburgh, PA 15219
Tel: 412-227-5944
lazzara@cohenseglias.com

**GARY N. MANSFIELD, ESQ.**  *(PHV to be submitted)*
**FBN: 61913**
MANSFIELD BRONSTEIN & STONE, LLP
200 E. Broward Blvd., Suite 1250
Fort Lauderdale, FL 33301
Tel: 954-601-5600
litigation@mblawpa.com

*Attorneys for Plaintiffs*

# EXHIBIT "A"

DocuSign Envelope ID: 58B904FD-098C-46AF-95F8-1EF06293CC3D

# ◆◇◆ BTL Industries, Inc.

**QUOTATION**

362 Elm St
Marlborough, MA 01752
Phone (866) 285-1656   Fax (888) 499-2502
www.btlaesthetics.com   info@btlnet.com

| | |
|---|---|
| **Office:** | Reve Body Sculpting |
| **Street:** | 12238 Shelbyville Rd |
| **City, State, Zip:** | Louisville, KY 40243 |
| **Phone:** | 270-366-6201 |
| **Key MD:** | Amy Stone |
| **Key Operator:** | |

**Physican's Email:**
amyloum10@gmail.com
**Operator's Email:**

| Date | BTL Representative | Terms of Delivery |
|---|---|---|
| **August 12, 2022** | **Meghan Austin** | **FCA Marlborough, MA** |

| Qty | Product # | Description | Unit Price | Total |
|---|---|---|---|---|
| 1 | A899.001/130 | EMsculpt NEO® with Small RF+HIFEM applicators | $319,000.00 | $319,000.00 |
| | | System includes: Emsculpt NEO® one set of large and one set of small applicators, power cord. | | |
| | | The applicators are free from defects for a period of 9,000 minutes of treatment. | | |
| | | All other parts of the device are covered for the remainder of the original warranty, one year. | | |
| | | Large and Small applicator replacement cost is $15,000 if you are in compliance with MAP. | | |
| | | This should be approximately 300 patient treatments with each set of applicators. | | |
| 1 | A744.022 | CELLUTONE® System | $89,000.00 | $89,000.00 |
| | | system includes: CELLUTONE® applicator, 3 x additional transmitters | | |
| | | Discount: | $194,000.00 | ($194,000.00) |

**This tax is an estimate and the customer is responsible for any difference upon invoice.***

| | |
|---|---|
| Subtotal | $214,000.00 |
| ☐ Include Freight in Tax   Shipping | $1,885.00 |
| SubTotal | $215,885.00 |
| Sales tax rate | 8.640% |
| Sales rate* | $18,489.60 |
| **Total** | **$234,374.60** |

**Payment Terms:**

By signing below, the Customer is entering into a binding agreement for the purchase of the equipment and/or services described and accepts the Terms and Conditions of Sale attached to this Quotation and any Additional Terms written below. Federal law restricts the equipment to sale by or on the order of a licensed practitioner.

**Additional Terms**

VIP Approved Discount: Cleveland Clinical Training Unit+ Cellutone Device; 2 Testimonial Vidoes, 3 Before and After Photos, 2 Referral Phone Calls. Rebate check for Emsculpt NEO TV spots: 5k

Signature (Authorized Representative): *Amy Stone* — DocuSigned by: Amy Stone
Print Name, Title:
Date: 8/15/2022

**Credit Card Authorization (max 10% from transaction value):**

| | | | |
|---|---|---|---|
| Credit Card Type: | [ ] Master Card | [ ] Visa | [ ] AMEX |
| Credit Card Number: | | | |
| Expiration Date: | | CV2 # | |
| Name as it appears on card: | | | |

**BTL Industries, Inc. ("BTL") Terms and Conditions of Sale** BTL provides its quotation and offer for sale of the Equipment listed above under the following terms and conditions only.

**Payment Terms.** Customer must pay a non-refundable deposit or the entire balance for all Equipment Customer must pay a non-refundable deposit or the entire balance for all Equipment and services including all taxes, fees and similar charges imposed by any governmental authority, before BTL will ship the Equipment or render the services. Interest will be charged at the rate of 18% per year, but not more than the highest rate permitted by applicable law, on accounts more than 30 days past due. All sales are final.

**Security Interest.** BTL reserves and the Customer grants to BTL a security interest in all Equipment sold and all proceeds to secure the full payment and performance by the Customer of its liabilities and obligations to BTL.

**Customer Representations.** Customer represents and agrees that Customer will use the Equipment in accordance with the Operator's Manual and with applicable federal, state, and local laws and regulations.

**Warranty.** BTL warrants to Customer only that the Equipment will be free from defects in material and workmanship which BTL determines in the exercise of its reasonable judgment impairs the ordinary use of the Equipment. The Warranty is limited to

> (1) one year from the date of shipment by BTL,
> (2) under normal use and service,
> (3) operated in a manner consistent with the specifications set forth in the Operator's Manual,
> (4) Equipment serviced by authorized BTL personnel only, and
> (5) Equipment using BTL-approved components.

This Warranty shall be void if any of these conditions are not met; if the Equipment has been subject to abuse, misuse, neglect, or accident; if the Equipment has been improperly stored, handled, or maintained; or if persons other than authorized BTL service personnel attempt or actually dismantle, disassemble, alter, or modify the Equipment. Customer's only remedy is that BTL will repair or replace a nonconforming part and supply the labor required to correct any defect, so long as the defect is reported to BTL during the warranty period. This Warranty is non-transferable. Consumable or disposable parts or accessories of the Equipment that are purchased at a future date will be sold with their own warranties and are not included in this Warranty. No amendment to this Warranty is effective unless it is in writing and signed by BTL.

**Warranty Disclaimer.** THE ABOVE IS BTL'S ONLY WARRANTY OBLIGATION, AND THE REMEDY PROVIDED ABOVE IS IN LIEU OF ANY AND ALL OTHER REMEDIES. THERE ARE NO OTHER AGREEMENTS, GUARANTEES, OR WARRANTIES, ORAL, WRITTEN, EXPRESSED, IMPLIED, OR STATUTORY, INCLUDING, WITHOUT LIMITATION TO, WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. BTL SHALL NOT BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES DUE TO ANY CAUSE WHATSOEVER.

**Restrictions on Resale.** Customer agrees not to sell the Equipment to a third party unless such third party has been trained and certified by BTL to use the Equipment and Customer has provided the third party's name and contact information to BTL.

**Trademarks. BTL Marks shall mean any registered or unregistered trademarks or trade names** in the USA owned by BTL or its affiliates, or licensed to BTL. The Customer is granted a nonexclusive, non-transferable, limited license to use the BTL Marks that identify the specific Equipment and related services, for the express purpose of identifying and advertising the Equipment and related Services that Customer offers. Customer agrees to add such BTL Marks to its website within 30 days from delivery of the Equipment. Customer agrees not to obtain, register, or use any trademarks, internet domain(s), or business entity name(s) consisting of or incorporating the BTL Marks. Customer acknowledges its use of BTL Marks inures solely to BTL's benefit. Customer shall not debrand, rebrand, or private label any BTL Equipment or Service. This limited license to use the BTL Marks is subject to compliance with the terms of this Agreement.

DocuSign Envelope ID: 58B904FD-098C-46AF-95F8-1EF06293CC3D

**Marketing Services.** If Customer purchases a marketing services package as part of this Agreement, then BTL and Customer will make reasonable efforts to cooperate in the provision of those services. BTL makes no representations or warranties with respect to any third-party marketing services including, but not limited to, any warranty of merchantability and warranty of fitness for a particular purpose.

**No Liability for Marketing Services.** IN NO EVENT WILL BTL BE LIABLE TO CUSTOMER FOR ANY DAMAGES ARISING OUT OF CUSTOMER'S USE OF ANY MARKETING SERVICES, INCLUDING THE PROVISION OF THIRD-PARTY MARKETING SERVICES (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF USE, REVENUE OR PROFIT, BUSINESS INTERRUPTION, AND LOSS OF INFORMATION).

**Data Collection.** BTL reserves the right to periodically collect Equipment usage data for the purpose of running diagnostics and improving usability and performance. Data collected will not contain any patient identification information.

**Applicator Lifetime.** The Emsculpt and Emsculpt NEO® applicator lifetime is set to 9,000 minutes.

**Minimum Advertised Pricing Policy.** If Customer participates in Emsculpt NEO® MAP (minimum advertised pricing of $850/ treatment) and Emsculpt MAP (minimum advertised pricing of $750/ treatment), BTL will offer the following benefits:

(1) include Customer in BTL's provider directory,
(2) 2nd and 3rd year warranty service coverage at no charge (annual value of $15,000) on the Emsculpt or Emsculpt NEO device (excluding consumable and replacement parts), and
(3) discount from list price for replacement applicators (Emsculpt applicators discounted from $30,000 to $10,000; Emsculpt NEO applicators discounted from $30,000 to $15,000).

BTL will provide Customer with a written notice for the first non-compliance with MAP, and a second infraction will result in loss of benefits. Examples of non-compliance to MAP policy include representing over the phone, promoting, or publishing:

- Treatments at a price below the MAP
- "Buy one, get one" offers
- Package offers averaging out to less than MAP
- Statements such as or similar to "we will beat any price" or "guaranteed lowest pricing anywhere"
- Participating in social coupons and discount sites

Any modification to the MAP policy must be in writing by BTL. BTL sales employees or independent contractors do not have the authority to modify or grant exceptions to this policy. BTL reserves the right to adjust the MAP at its sole discretion at any time. BTL may also designate promotional periods during which the policy terms change.

**Governing Law; Jurisdiction.** This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts. The Customer agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston, Massachusetts.

**Entire Agreement.** Customer agrees to purchase according to these terms and conditions. No other terms and conditions apply unless BTL and Customer expressly agree in writing.

| | |
|---|---|
| **Signature (authorized Representative)** | *Amy Stone* (DocuSigned by) |
| **Print Name** | Amy Stone |
| **Date:** | 8/15/2022 |

# EXHIBIT "B"

DocuSign Envelope ID: 98ED63C9-8BC9-4521-90C4-954039B9E95C

# MMP CAPITAL

EQUIPMENT FINANCE AGREEMENT

Original Copy held by the designated custodian

EFA No.: _202208.51459_  Date: _9/6/2022_

| Creditor ("we," "us" and "our"): MMP CAPITAL, LLC | Debtor ("you" or "your"): AIM Group, LLC DBA Reve Body Sculpting |
|---|---|
| 19 Engineers Lane, Farmingdale, NY 11735 | 12238 SHELBYVILLE RD, LOUISVILLE, KY 40243 |
| Equipment Supplier ("Supplier"): BTL Industries | Equipment Location: |
| 362 ELM ST, MARLBOROUGH, MA 01752 | 12238 SHELBYVILLE RD, LOUISVILLE, KY 40243 |

**Financed Equipment Description ("Collateral"):** Emsculpt Neo Workstation

The Collateral is generally described above and herein which Creditor and Debtor agree that a more detailed description of said Collateral being financed shall be maintained by us among our books and records in whatever more detailed description of the Collateral being financed is received from the supplier of such Collateral and, absent manifest error, such detailed description shall be considered incorporated into this Equipment Finance Agreement ("EFA") and shall be provided to Debtor within a reasonable time upon request.

| Advanced Payment (if any): $99.00 | Monthly Installment Payment ("Payments"): 3 @ $99.00; FOLLOWED BY 60 @ $3,897.61 | Term: 63  (Mos.) |
|---|---|---|
| Documentation Fee (if any): $950.00 | | |

**Agreement.** Creditor agrees to lend to Debtor and you agree to borrow from us an amount for the financing of the Collateral. You authorize us to pay the supplier(s) for the Collateral. You authorize us to commence this EFA. You authorize us to insert or correct information in this EFA, including your proper legal name, address, serial numbers and any other information describing the Collateral. You acknowledge that the payment obligations hereunder have commenced notwithstanding that the Collateral may not have been delivered, installed or accepted by you. Amounts received by us under this EFA shall be applied as we determine. Debtor promises to pay Creditor the Payments set forth above. Upon execution of this EFA, you will deliver to us the Advance Payment as set forth above, which you agree is non-refundable. To the extent permitted by law, we may charge you a fee not to exceed $950, plus any applicable sales/use tax, to cover documentation and credit investigation costs. Payments may be adjusted upward or downward no more than fifteen percent (15%) to reflect actual cost. The first Payment is due at the commencement of Creditor's applicable billing cycle as specified by the Creditor; each subsequent Payment is due on the same date of each preceding month until all Payments have been received by Creditor. Each date a Payment is due is a "Due Date" and along with the Payment due on the first Due Date, Debtor agrees to pay us a prorated payment for an amount equal to 1/30th of the Payment amount for each day calculated from the date Creditor paid the vendor until the first Due Date (the "Prorated Payment"). The Prorated Payment shall be due upon execution of this EFA. Any amount not paid when due is subject to a late charge of the greater of fifty dollars ($50.00) or ten percent (10%) of such delinquent amount, but not more than the highest rate allowed by law. You acknowledge and agree that you shall bear sole responsibility for and shall have no claim against and Lender shall have no liability in the event the Collateral is: (a) not delivered; (b) damaged during transit (c) not properly installed or functioning upon installation; (d) defective or otherwise fails to perform in accordance with Supplier's specifications; or (e) otherwise unacceptable to you for any other reason.

**Information; Credit Reports.** YOU AUTHORIZE US AND OUR ASSIGNEES TO OBTAIN CREDIT REPORTS AND MAKE CREDIT INQUIRIES AS WE DEEM NECESSARY. We will inform you upon request if we have sought a consumer credit report and the name and address of any credit reporting agency that provided a report. You agree that we may request and use additional credit reports to update our information without further notice to you as long as you have obligations under this Agreement. Upon our request, you agree to provide us with statements setting forth your financial condition and operations. You warrant that all information you have and will deliver to us, including the information in this EFA, is true, accurate and correct and you acknowledge that we are relying on such information to enter into this EFA.

**Grant of Security Interest.** You hereby grant us a perfected, first priority security interest in the Collateral, all accession and additions thereto, replacements or substitutions thereof, and all proceeds to secure all of your obligations under this EFA.

**Disclaimer of Warranties and Claims.** We make no representation or warranty or any matter whatsoever including the merchantability or fitness for particular purpose of the Collateral. This EFA is irrevocable. **Your obligation to pay all amounts hereunder is non-cancelable, absolute, and unconditional and will not be subject to any reduction, setoff, defense, counterclaim, deferment or recoupment for any reason, even if the Collateral is damaged, destroyed or defective. YOU ACKNOWLEDGE YOU SELECTED THE COLLATERAL AND THE SUPPLIER AND YOUR SUPPLIER IS NOT OUR AGENT, NOR ARE WE THEIR AGENT. YOU ACKNOWLEDGE THAT NO ONE, INCLUDING THE SUPPLIER, HAS BEEN AUTHORIZED TO WAIVE OR CHANGE ANY TERM OR CONDITION OF THIS EFA. NO REPRESENTATION BY THE SUPPLIER AS TO ANY MATTER SHALL BIND US OR AFFECT YOUR DUTY TO PAY ALL AMOUNTS AND PERFORM ALL OBLIGATIONS HEREUNDER.** You will use the collateral for commercial purposes only, in compliance with the law and not for any personal, family or household use.

**Collateral.** You will not modify or change the location of the Collateral without our prior consent and allow us to inspect it upon our request. At your expense, you will maintain the Collateral in good operating condition and repair. You will keep the Collateral free and clear of all liens and encumbrances, shall remain personal property and will not become fixtures. Titled Collateral will be titled and/or registered as we direct. You are responsible for any damage or destruction to the Collateral. You will at our election repair the Collateral at your expense or pay to us all amounts then due and owing plus the total of all unpaid Payments for the Term, discounted at the lower of 3% or the then current discount rate of the Federal Reserve Bank of New York as calculated by us.

**Fees and Taxes.** You agree to pay when due and to hold us harmless from all taxes, interest and penalties relating to this EFA and the Collateral ("Taxes") and reimburse us for those Taxes we pay on your behalf. If we pay any of the above for you, you agree to reimburse us and pay us a processing fee for each payment we make on your behalf. In addition, you also agree to pay us any filing fees prescribed by the Uniform Commercial Code (UCC) or other law and reimburse us for all costs and expenses involved in documenting and servicing this transaction. You also acknowledge that in addition to the other obligations due under this EFA, we may assess, and you may be required to pay additional taxes and/or fees including an invoice fee. Such fees may not only cover our costs, they may also include a profit.

**Insurance.** You agree to obtain and maintain at your expense property insurance for the full replacement value of the Equipment, protecting the Equipment against Loss, and liability insurance, in an amount acceptable to us, but in no event less than $1,000,000 covering any injury, death or third-party property damage arising out of or relating to use of the Equipment. If the Equipment must be titled under title registration laws ("Mobile") then you shall obtain and maintain all risk physical damage insurance. All insurance policies must provide that no cancellation shall be effective without thirty (30) days' prior

written notice to us. At our request, you agree to name any party who may have a security interest in the Equipment as Lender's Loss Payee. You agree to provide proof of insurance to us upon request. You hereby grant us a limited power of attorney allowing us to make a claim for, receive payment on, and endorse or execute for our benefit any instrument representing proceeds from any policy issued on the Equipment. IF YOU FAIL TO PROVIDE PROOF OF INSURANCE ACCEPTABLE TO US, WE HAVE THE RIGHT BUT NOT THE OBLIGATION TO SECURE INSURANCE IN SUCH FORM AND AMOUNT AS WE DEEM NECESSARY AND YOU AGREE THAT IN ADDITION TO INSURANCE PREMIUMS WE MAY CHARGE YOU INTEREST AT 2% PER MONTH AND/OR AN ADMINISTRATIVE FEE WHICH MAY RESULT IN A PROFIT TO US. YOU UNDERSTAND THAT IF WE PROCURE INSURANCE YOU MAY PAY MORE THAN IF YOU HAD PROCURED INSURANCE AND THE INSURANCE MAY NOT NAME YOU AS AN INSURED AND MAY NOT FULLY PROTECT YOU IN THE EVENT OF A LOSS. YOU AGREE THAT DISPUTES REGARDING INSURANCE OR FEES CHARGED FOR PROCURING INSURANCE WILL BE DETERMINED BY ARBITRATION CONDUCTED IN NASSAU COUNTY, NEW YORK UNDER THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION

**Debtor Indemnification.** You hereby agree to defend, indemnify and hold us and our agents, successors, assignees and employees harmless from any and all liability, damage, penalty, claims, actions, expenses, disbursements or loss, including attorneys' fees and court costs, arising out of or relating to this EFA, liabilities you have assumed hereunder, and the purchase, sale, financing, ownership, selection, installation, design, licensing, possession, operation, control, use, maintenance, servicing, repair, storage, shipment, transportation or delivery of the Collateral. The indemnities contained herein and all of our rights and remedies in this agreement shall survive the expiration or other termination of this EFA.

**Default and Remedies.** If any one of the following occurs, you will be in default: (i) you fail to pay any amount under this EFA when due; (ii) you cease doing business, admit your inability to pay your debts, or you file or have filed against you a petition under the Bankruptcy Code; (iii) you breach any other obligation contained in this EFA or under any other agreement with us; (iv) a writ or order of attachment or execution or other legal process is levied on or charged against the Collateral which is not released or satisfied within 10 days; (v) you change your state of organization without 30 days prior notice to us; or (vi) any of the above events of default occur with respect to any guarantor. Upon your default, we may do any of the following: (a) terminate this EFA; (b) foreclose on our security interest and require you to immediately turn over the Collateral to us at your sole expense, or we may peaceably repossess the same without liability for trespass, and upon receipt of the Collateral, sell the Collateral at terms we determine at one or more private sales, and apply the net proceeds (after deducting any related expenses) to your payment obligations, and you will remain liable for any deficiency with any excess being retained by us; (c) declare all sums due and to become due hereunder immediately due and payable, all future Payments discounted at the lower of three percent (3%) or the then-current discount rate of the Federal Reserve Bank of New York as calculated by us; (d) sell, dispose of, hold, or lease the Collateral; (e) exercise any other right or remedy which may be available to us under applicable law. You shall reimburse us for all costs we incur in enforcing our rights (including our attorneys' fees) and costs of repossession, repair, storage and remarketing of the Collateral. A waiver of default will not be a waiver of any other subsequent default.

**General.** This EFA shall be governed and construed under the laws of the State of New York (NY), without reference to its principle of conflicts of laws and is deemed to have been performed in Nassau County, NY. You submit to the jurisdiction of NY and agree that the state and federal courts sitting in Nassau County, New York, shall have the exclusive jurisdiction over any action or proceeding to enforce this EFA or any action or proceeding arising under this EFA. You acknowledge the jurisdiction may change at the sole discretion of MMP CAPITAL, LLC's successors and/or assigns. You waive any objection based upon improper venue and/or forum non-conveniens. You irrevocably grant us the right to make such filings under the UCC as we deem necessary. In addition to any late charges described herein, you agree to pay us interest on all past due amounts at the lower of 1.5% per month or the highest rate allowed by law. You will not assign your rights under this EFA, or permit the Collateral to be used by anyone but you. We may assign this EFA, in whole or in part, without notice to you or your consent. You agree that our assignee will have the same rights and benefits that we have now but none of our obligations, and you will not assert any claims, defenses or set offs against our assignee that you may have against us or any supplier. This EFA sets forth the entire understanding of the parties with respect to its subject matter and may only be amended in writing signed by both parties, except as otherwise stated in the section above titled "Agreement." You represent and warrant to us that (i) this EFA constitutes a legal, valid, and binding obligation, enforceable against you in accordance with its terms; (ii) you have the ability to perform all of your obligations under this EFA; and (iii) all information conveyed to us in connection with this EFA and all related documents whether by you, a guarantor, a Supplier or any other person, is true, accurate, complete and not misleading. This EFA may be executed in separate counterparts, which together shall be the same instrument. You agree this EFA may be signed electronically pursuant to the Electronic Signatures in Global and National Commerce Act and other applicable law. All fees may not only cover our costs but may include a profit. As long as you are not in default under this EFA, you may repay this EFA by paying an amount equal to the sum of any and all remaining Payments and any and all other fees currently due and payable. If Debtor constitutes more than one person, the liability of each shall be joint and several. A copy of this EFA (whether delivered by facsimile, in portable document format (PDF) or otherwise) shall be deemed an original for all purposes. Any notice given hereunder shall be in writing and deemed given two business days after being deposited with the US Postal Service, first class postage prepaid, and addressed to the Debtor or Creditor (as the case may be) at its address set for above, or such other address given to the sender by written notice. MMP CAPITAL, LLC is a registered Delaware Limited Liability Company. Each party waives any right to a jury trial.

MMPLLC2022

**EQUIPMENT FINANCE AGREEMENT**

This is a copy view of the Authoritative Copy held

EFA No.: 20220851459  Date:  9/6/2022

By signing below, Debtor hereby irrevocably accepts the Collateral under the EFA and irrevocably authorizes Creditor to pay the Supplier on behalf of the Debtor. The person executing this EFA is authorized to do so, making this EFA the valid binding act of the Debtor.

| Debtor: AIM Group, LLC DBA Reve Body Sculpting | Accepted by MMP CAPITAL, LLC |
|---|---|
| By: *Amy Stone* | By: *JP Smolenski* |
| Print Name: Amy Stone | Print Name: JOHN-PAUL M. SMOLENSKI |
| Title: Member      Date: 9/7/2022 | Title: MEMBER |
| Debtor Tax ID: 83-4473787 | Date: 9/7/2022 |

**GUARANTY:** In consideration of Creditor entering into the EFA, the undersigned, together and separately, unconditionally, personally and irrevocably guarantee to Creditor the prompt payment and performance of all Debtor's obligations now and/or hereafter owes to Creditor. You agree that this is a guaranty of payment, not collection, and that Creditor can proceed directly against you without first proceeding against Debtor or the Collateral. You waive notice of acceptance, acceleration and default and all defenses, including protest, presentment and demand. Creditor may renew, extend or otherwise change the terms of the EFA without notice to you and you will be bound by such changes, and you will pay all of Creditor's costs of enforcement and collection, including reasonable attorneys' fees. This Guaranty is binding on your heirs, administrators, representatives, successors and assigns and survives the insolvency, bankruptcy or discharge from bankruptcy of Debtor. THIS GUARANTY WILL BE GOVERNED BY NEW YORK LAW. YOU AGREE TO JURISDICTION AND VENUE IN THE STATE AND FEDERAL COURTS AS SET FORTH IN THE EFA.

| Guarantor's Signature: *Amy Stone* | Print Name: Amy Stone | Date: 9/7/2022 |
|---|---|---|

**AUTHORIZATION FOR ACH PAYMENTS:** Debtor hereby authorizes and requests MMP CAPITAL, LLC ("Creditor"), and/or its successors or assigns, to initiate electronic debit entries or effect a change by any other commercially accepted practice, to the account indicated below, and hereby authorize the named below financial institution ("Bank") to honor the debit entries initiated by Creditor or its assignee and debit the same to such account. This authorization is to remain in full force and effect until such time that Creditor has received written notification from Debtor of its termination in such time and in such manner as to afford Creditor and the Bank a reasonable opportunity to act on same. Debtor understands that the withdrawal of this authorization without the written consent of Creditor shall constitute default of the Equipment Finance Agreement for which this payment is being made.

| Debtor Bank Name: US Bank | | Bank Phone #: | | |
|---|---|---|---|---|
| Address: | | City: | State: | Zip: |
| Name on Account: AIM Group LLC | ABA #: 042100175 | | Bank Account #: 145812860826 | |
| By: *Amy Stone* | Print Name: Amy Stone | | Title: Member | Date: 9/7/2022 |

PLEASE COMPLETE THE BELOW STATEMENT OF AUTHORITY IF APPLICABLE.

**CORPORATE OR LIMITED LIABILITY COMPANY STATEMENT OF AUTHORITY**

This Statement of Authority is executed pursuant to the Business Corporations Act or Limited Liability Company Act (as the case may be) of the state  KY  regarding  AIM Group, LLC DBA Reve Body Sculpting  (the "Company").

The following persons are the Directors or Officers of the Company or Members, Managers or Officers of the Company (as the case may be) and have full power and authority to act on behalf of the Company and execute all instruments on behalf of the Company and to any contract, including, but not limited to, this Equipment Finance Agreement.

| Print Name | Title | Signature |
|---|---|---|
| Amy Stone | Member | *Amy Stone* |

The authority of the foregoing persons to bind the Company is not limited.

Executed  9/7/2022

| By: *Amy Stone* | Print Name: Amy Stone | Title: Member |
|---|---|---|

DocuSign Envelope ID: 98ED63C9-8BC9-4521-90C4-95403959E95C

EQUIPMENT FINANCE AGREEMENT
EFA No.: 20220851459    Date: 9/6/2022

# PAY PROCEEDS

RE: Equipment Finance Agreement dated __9/6/2022__ between MMP CAPITAL, LLC as Creditor, and __AIM Group, LLC DBA Reve Body Sculpting__ as Debtor.

In connection with the above referenced Agreement, you are hereby irrevocably authorized to disburse the following sum(s) to the following Payee(s):

| **Payee** | **Amount** |
|---|---|
| BTL Industries | $150,000.00 |
|  | (Plus Applicable Freight & Sales Tax) |
|  |  |
|  | (Plus Applicable Freight & Sales Tax) |

Debtor hereby authorizes Creditor to insert in the above referenced Agreement, the commencement date of installment repayments, which date shall be 30 days after the date the Creditor remits payment pursuant to this Pay Proceeds authorization (unless otherwise noted).

By: _Amy Stone_____

Name: __Amy Stone__

Date: __9/7/2022_____

MMPLLC2022

DocuSign Envelope ID: 98ED63C9-8BC9-4521-90C4-954039B9E95C

EQUIPMENT FINANCE AGREEMENT
This is a copy view of the Authoritative Copy held
EFA No.: 20220851459 Date:   9/6/2022
by the eOriginal system of record.

# EQUIPMENT ACCEPTANCE CERTIFICATE

| Customer Name | Customer Number | Transaction Number |
|---|---|---|
| AIM Group, LLC DBA Reve Body Sculpting | | |

This certificate (the **Acceptance Certificate**) is entered into by the undersigned **Customer** (also **you** or **your**) in favor of **MMP CAPITAL, LLC** (also **we**, **us** and **our**) in connection with the EFA, Lease, and/or other financing agreement identified by the Transaction Number above (the **Agreement**). Any defined term not otherwise described herein shall have the same meaning ascribed to it in the Agreement or the other documents related thereto.

> **As of the Acceptance Date set forth below, you hereby confirm that (i) the equipment listed in the attached Schedule A (the Equipment) has been delivered to you, installed, and/or is operating as intended, (ii) you unconditionally and irrevocably accept such Equipment and (iii) you understand and agree to be responsible for, perform and comply with, all of the obligations, terms and conditions of the Agreement and related documents.**

In connection with your acceptance of the Equipment, you acknowledge and agree to the following:

1. You selected the Equipment, accept it AS IS and WE MAKE NO EXPRESS OR IMPLIED WARRANTIES AS TO ITS MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE; you shall look only to the vendor/supplier of the Equipment (the **Vendor**) or manufacturer (not us) for any claim concerning the Equipment, which shall not relieve you from any obligations to us, including any payment obligations; and YOU HEREBY WAIVE AGAINST US, AND WE SHALL NOT BE LIABLE FOR ANY, CLAIM FOR LOSS, INJURY OR DAMAGE CAUSED BY THE EQUIPMENT, INCLUDING BUT NOT LIMITED TO, ALL SPECIAL, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR EXEMPLARY DAMAGES.

2. You selected any software included on and/or within the Equipment (collectively, the **Software**); you assume all liability related to any unauthorized access or use of the Software and any data collected, stored, used or accessed by the Equipment and/or Software (the **Data**); we do not own or license any Software or Data; and we have no duty to configure, maintain and/or otherwise safeguard the Software and/or Data.

3. Neither the Vendor nor any of its salespersons or other agents are agents of ours or are authorized to waive or modify any term or condition of this Acceptance Agreement, the Agreement and/or related documents. Any representation as to the Equipment or any other matter made by the Vendor shall not in any way affect your duty to make payments to us and perform all your other obligations as set forth in the Agreement or the other documents related thereto.

**Execution.** This document may be signed via digitally generated signatures and all signatures so generated, as well as those transmitted by facsimile, email, digital photography or other electronic means, shall for all purposes be deemed effective, binding, legally admissible and have the same effect as a manually applied ink signature.

CUSTOMER:   AIM Group, LLC DBA Reve Body Sculpting

ACCEPTANCE DATE:    9/7/2022

ACCEPTED BY:

Signature:   _Amy Stone_  (DocuSigned by) 69876D75BA74485...

Printed Name:   Amy Stone

Title:   Member

MMPLLC2022

This is a copy view of the Authoritative Copy held by the Designated Custodian.

EQUIPMENT FINANCE AGREEMENT
EFA No.: 202208151459 Date: 9/6/2022

## SCHEDULE A TO ACCEPTANCE CERTIFICATE

| Customer Name | Customer Number | Transaction Number |
|---|---|---|
| AIM Group, LLC DBA Reve Body Sculpting | | |

This **Schedule A** represents an integral part of the Acceptance Certificate referenced by the Transaction Number above and amends any prior Schedule A connected with the Agreement identified by such Transaction Number.

### Titled Equipment

| Year | Manufacturer | Model | VIN/Serial Number | Equipment Location | Vendor |
|---|---|---|---|---|---|
| | | | | | |

### Equipment

| Description | Serial Number | Equipment Location | Vendor |
|---|---|---|---|
| Emsculpt Neo Workstation | 89900B003058 | 12238 SHELBYVILLE RD, LOUISVILLE, KY 40243 | BTL Industries |

MMPLLC2022

DocuSign Envelope ID: 98ED63C9-8BC9-4521-90C4-954039B9E93C

MMP CAPITAL

This is a copy view of the Authoritative Copy held

**EQUIPMENT FINANCE AGREEMENT**
EFA No.: 202208.51459    Date:   9/6/2022

### INSURANCE CONFIRMATION

Insurance Company: _____    Agent Name: _____

Agent Contact Info: _____

We have entered into a financing agreement for the following equipment for <u>AIM Group, LLC DBA Reve Body Sculpting</u> with a value of  <u>$160,473.40</u> . To be located at: <u>12238 SHELBYVILLE RD, LOUISVILLE, KY 40243</u>

Equipment: <u>Emsculpt Neo Workstation</u>    Serial Number(s):    89900B003058

This is a net financing arrangement and we are responsible for the insurance cost. Please see that we have immediate coverage and notify the company shown below at once in the form of a copy of the insurance policy or a Certificate of Insurance. If the latter is sent, please provide therein for thirty (30) day notice in the event of cancellation or alteration.

**PHYSICAL DAMAGE**: Property coverage is to provide for fire, theft, extended coverage, vandalism and malicious mischief for the full value of the equipment. The company named below is to be named a **Loss Payee**, as its interests may appear.

**LIABILITY**: Coverage should be written with minimum limit of $1 Million for BODILY INJURY and PROPERTY DAMAGE, combined. The company named below is to be named as **Additional Insured**.

**CANCELLATION:** Should any of the above described policies be canceled before the expiration date thereof, Notice will be delivered in accordance with the policy provisions.

**DEDUCTIBLES:** Deductible to be indicated on policy.

### PLEASE INCLUDE THE FOLLOWING ON ALL INSURANCE DOCUMENTATION:

| <u>**CERTIFICATE HOLDER**</u> | |
|---|---|
| **- Loss Payee/Additional Insured:**<br>MMP CAPITAL, LLC, ISAOA<br>19 Engineers Lane<br>Farmingdale, NY 11735 | **- EFA Number:**   202208.51459<br><br>**- Equipment:**          **- Policy:**<br>• Value                   • Business Name<br>• Description           • Coverage Limits<br>• Serial Number(s)   • Deductible Amounts<br>• Location Address |

### EQUIPMENT FINANCE AGREEMENT LANDLORD'S WAIVER RIDER

This Rider ("Rider") modifies the Equipment Finance Agreement dated 9/6/2022   (the "EFA") by and among <u>AIM Group, LLC DBA Reve Body Sculpting</u> (the "Debtor") and MMP CAPITAL, LLC (the "Creditor"). All capitalized terms used but not defined herein shall have the meanings set forth in the EFA.

1. Debtor acknowledges and agrees that it is required under the EFA to procure and deliver to Creditor a fully and properly executed Landlord's Waiver ("Waiver") in a form acceptable to Creditor.
2. If Debtor fails to deliver to Creditor an executed Waiver within fourteen (14) days of the effective date of the EFA, and until such time that Debtor delivers such executed Waiver to Creditor, Creditor shall have the right to charge Debtor a monthly administrative fee equal to two-percent (2%) of the loan balance existing at that time (the "Fee"). The Fee shall be deemed an obligation under the EFA and any failure to pay such Fee shall be an Event of Default under the EFA.
3. Debtor acknowledges and agrees that the Fee is necessary to protect Creditor as (i) the actual damages resulting from Debtor's failure to provide an executed Waiver are difficult to determine and (ii) the value of the loan under the EFA will be diminished absent Creditor's receipt of the Waiver.
4. Each party hereto shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of the EFA and this Rider, including, without limitation, the Landlord's Waiver.
5. Pursuant to the EFA, Debtor shall keep the Collateral free and clear of all liens and encumbrances, and grants to Creditor a perfected, first priority security interest in the Collateral, all accession and additions thereto, replacements or substitutions thereof, and all proceeds to secure Debtor's obligations under the EFA and this Rider, regardless of whether Debtor actually obtains an executed Waiver.
6. In the event of a conflict between the terms of the EFA (including any and all attachments thereto and amendments thereof) and the terms of this Rider, the terms of this Rider shall control.
7. Except as expressly provided herein the terms of the EFA shall remain in full force and effect.

| By signing below, Debtor hereby acknowledges that failure to provide acceptable proof of insurance or executed Landlord's Waiver to Creditor within 14 days of the effective date of the EFA will result in monthly fees, each at two-percent (2%) of the loan balance. | |
|---|---|
| **MMP CAPITAL, LLC**<br><br>By: *JP Smolenski* | AIM Group, LLC DBA Reve Body Sculpting<br><br>By: *Amy Stone* |
| Print Name: JOHN-PAUL M. SMOLENSKI | Print Name: Amy Stone |
| Print Title: MEMBER | Print Title: Member |

MMPLLC2022

DocuSign Envelope ID: 98ED63C9-8BC9-4521-90C4-954039B9E95C

MMP CAPITAL

EQUIPMENT FINANCE AGREEMENT

This is a copy view of the Authoritative Copy held by MMP Capital

EFA No.: 202208.51459    Date:  9/6/2022

## INDIVIDUAL GUARANTY

| Creditor: MMP CAPITAL, LLC<br>19 Engineers Ln<br>Farmingdale, NY 11735 | Debtor:<br>AIM Group, LLC DBA Reve Body Sculpting<br>12238 SHELBYVILLE RD, LOUISVILLE, KY 40243 |
|---|---|
| Contract being guaranteed:<br><br>EFA No. 202208.51459<br><br>between Creditor and Debtor, dated: 9/6/2022 | Guarantor:<br><br>Amy Stone |

THIS PERSONAL GUARANTY (this "**Guaranty**"), effective as of the contract date specified above, is made and entered into by the undersigned person(s) in his/her/their capacity as an individual, in favor of MMP CAPITAL, LLC, a Delaware Limited Liability Company, and its successors and assigns. In this Guaranty the words "**I**", "**me**" and "**my**" refer to each of the undersigned guarantors, and the word "**Creditor**" refers to the creditor, MMP CAPITAL, LLC, and its successors and assigns.

I desire that Creditor extend business credit and/or other financial accommodations to the above named debtor (the "**Debtor**") pursuant to the above referenced contract(s) and all related agreements and documents (collectively, the "**Contract**") entered into by and between you and Debtor. I hereby represent to Creditor that I have a substantial interest, either financial or otherwise, in the Debtor entity and it is to my benefit that Creditor enter into the Contract with Debtor. I have read the Contract in full and find the Contract terms to be fair and acceptable. I hereby acknowledge that Creditor would be unwilling to enter into the Contract and extend credit to Debtor without my acceptance of this Guaranty, and I understand that Creditor is acting in reliance on my acceptance.

Therefore, in order to induce Creditor to enter into and perform the Contract and extend credit to Debtor, I **(and if there is more than one, then all of us, individually, jointly and severally) hereby PERSONALLY, unconditionally and irrevocably guarantee Debtor's faithful and full performance of all Contract terms and conditions, including, without limitation, the payment of all money due and to   become  due under the Contract plus any  and all of Creditor's costs (including reasonable attorneys fees and litigation costs) to enforce the Contract and/or this Guaranty.** I understand that my obligations are joint and several with (i.e., separate and in addition to) those of the Debtor and any other guarantor and are independent of Debtor's obligations under the Contract and any other guarantor's obligations under this or any other guaranty. I agree my liability under this Guaranty is primary, and that a separate legal action may be brought against me immediately and without any demand or notice regardless of whether or not an action is brought against Debtor or another guarantor or whether Debtor or another guarantor is joined in such action. I agree that Creditor may proceed against me without also proceeding against any other guarantor or exhausting or proceeding against the equipment collateral or other collateral or security given by Debtor.

I hereby knowingly waive: (i) the benefit of any suretyship defenses that might affect my liability under, or the enforcement of, this Guaranty, (ii) any right to require Creditor to proceed against Debtor, or against or exhaust the collateral or other security under the Contract, or to pursue any other remedy that might be available to Creditor, including, without limitation, any rights pursuant to O.C.G.A. Section 10-7-24, (iii) any defense arising by reason of any defense of Debtor under the Contract, or by reason of Debtor's release from, or discharge of, liability under the Contract, regardless of the cause or source thereof, (iv) the defense of impairment of collateral, (v) notice by Creditor of its acceptance of this Guaranty, and (vi) presentment of this Guaranty and notice of presentment.

I authorize Creditor to renew, extend, accelerate or amend the Contract payment terms or other Contract terms without prior notice or demand to me and without affecting my liability under this Guaranty. Creditor may sell, assign or transfer this Guaranty, in whole or in part and without prior notice to me, and in this event, I promise to honor this Guaranty in favor of any such assignee or transferee. I understand that this Guaranty is binding on my successors, heirs, and personal representatives and shall inure to the benefit of Creditor and its successors and assigns.

I agree that this Guaranty shall be considered to have been made, and purposefully delivered by us to Creditor, in the State of New York, and **I agree that this Guaranty shall be interpreted in accordance with the laws and regulations of the State of New York.** By delivering this Guaranty to Creditor in New York, I concede and agree that I transacted business in the State of New York and **I am subject to personal jurisdiction in the state and federal courts of the State of New York** in any legal action, suit or proceeding regarding the Contract or this Guaranty. In the event Creditor brings any legal action against me regarding the Contract, I agree to bring it only in a New York state or federal court and agree that venue shall be laid in the New York County of Nassau. **I hereby knowingly waive my right to a trial by jury.**

I agree that this Guaranty will continue for as long as there are any unfulfilled obligations of Debtor under the Contract, and this Guaranty will cross collateralize any and all Contracts between Debtor and Creditor. I agree this is a continuing guaranty which will not be discharged or affected by my death and will bind my heirs and personal representatives. This Guaranty is the full and complete agreement regarding my guarantee of the Debtor's obligations to Creditor and supersedes (i.e., cancels and replaces) all prior oral or written agreements or understandings that I have regarding my guarantee. No provision of this Guaranty may be modified, rescinded or waived unless in writing signed by one of Creditor's executive officers. Waiver by Creditor of any provision of this Guaranty in one instance shall not constitute a waiver as to any other instance. A telefaxed signature copy of this Guaranty shall be considered as valid and binding as the original for all purposes.

I understand that this Guaranty creates a **personal** obligation. I represent to Creditor that I have had an adequate opportunity to consult with my counsel to explain to me the terms of this Guaranty before I signed it.

GUARANTOR

By: _Amy Stone_  (DocuSigned by: Amy Stone, 69876D75BA74485...)

Name: _Amy Stone_

DocuSign Envelope ID: 98ED63C9-8BC9-4521-90C4-954039B9E93C

EQUIPMENT FINANCE AGREEMENT

This is a Copy View of the Authoritative Copy held

EFA No.: 202208.51459 Date: 9/6/2022

**EXHIBIT 2**
**TO MASTER ASSIGNMENT AGREEMENT**
**FORM OF NOTICE AND ACKNOWLEDGMENT OF ASSIGNMENT**

## NOTICE AND ACKNOWLEDGMENT OF ASSIGNMENT

This Notice and Acknowledgment of Assignment dated as of __09/15/2022__, is made by MMP Capital, LLC ("Originator") and _AIM Group, LLC DBA Reve Body Sculpting_ ("Debtor") concerning Equipment Finance Agreement No. _202208.51459_ dated _9/6/2022_ (the "EFA") between Originator and Debtor.

**NOTICE OF ASSIGNMENT**: Originator hereby notifies and directs Debtor that:

A. Originator has assigned all of its rights under the EFA to Dext Capital, LLC ("Assignee"), as of __09/15/2022__ (the "EFA Assignment Date").

B. Until further written notice to the contrary is received by Debtor from Assignee, all EFA payments and any other payments due on and after the EFA Assignment Date under the EFA (the "Monies") shall be paid by the date due directly by Debtor to Dext Capital, LLC at the following address (until further notice):

5285 Meadows Road Suite 335, Lake Oswego, OR 97035

**ACKNOWLEDGMENT OF ASSIGNMENT**: Debtor consents to the assignment herein by Originator and will remit and deliver all Monies directly to the paying agent for the Assignee at the address set forth above and Debtor acknowledges that:

(i) the regular monthly payment as outlined in the below table, exclusive of applicable taxes shall be due and payable on the First or Last day of each month during the term beginning with any payments due as of the commencement date set forth in the EFA and the consecutive monthly payment periods as outlined below;

| EFA No. | Monthly Payment Amount | Assignment Date | Ending Date | No. of Months Assigned |
|---|---|---|---|---|
| 202208.51459 | 3 Monthly Payments @ $95.00 Followed by 60 Monthly Payments @ $3,897.61 | 09/15/2022 | 11/56/2027 | 63 |

(ii) there are no additional agreements between Debtor and Originator relating to the equipment ("Equipment") under the EFA; (iii) the EFA is in full force and effect; (iv) the Equipment currently is in Debtor's possession and control at the location(s) specified in the EFA; (v) it will not enter into any agreement amending, modifying or terminating the EFA without the prior written consent of Assignee; (vi) it has not made with respect to Originator, nor will it make with respect to Assignee, any claims, offsets, demands or defenses of any kind, nature or description with reference to any of Originator's or Debtor's obligations under the EFA; and (vii) it has executed only one (1) original equipment schedule marked as Counterpart No. 1.

Debtor also acknowledges and agrees that it will deliver copies of all notices and other communications given to or made by Debtor pursuant to the EFA, to Assignee at the following address:

Dext Capital, LLC, 5285 Meadows Road Suite 335, Lake Oswego, OR 97035

**FURTHER AGREEMENTS:** Upon execution of this Notice and Acknowledgment by Originator and Debtor and acceptance hereof by Assignee, Assignee agrees that in lieu of any covenant of quiet enjoyment that may be given on behalf of Assignee in the EFA, Assignee hereby covenants that so long as Debtor is not in default of any provisions of the EFA and has not breached any of its covenants or representations in this Notice and Acknowledgment, Assignee will not disturb the Debtor's quiet and peaceful possession of the Equipment or its unrestricted use thereof for its intended purpose.

IN WITNESS WHEREOF, the parties hereto have caused this Notice and Acknowledgment of Assignment to be executed by their authorized officers as of the date set forth above.

MMP CAPITAL, LLC (Originator)                          AIM Group, LLC DBA Reve Body Sculpting (Debtor)

By: _JP Smolenski_                                     By: _Amy Stone_
Its: _John-Paul M. Smolenski, Member_                  Its: _Amy Stone, Member_


Accepted by:

DEXT CAPITAL, LLC (Assignee)

By: _____

Its: _____

MMPLLC2022

**DocuSign**

## Certificate Of Completion

Envelope Id: 98ED63C98BC9452190C4954039B9E95C    Status: Completed
Subject: EFA - AIM Group, LLC DBA Reve Body Sculpting - 202208.51459
EFA Number:
Debtor Name:
Approval Number:
Source Envelope:
Document Pages: 8                   Signatures: 13              Envelope Originator:
Certificate Pages: 5                Initials: 0                 Christopher Hagmaier
AutoNav: Enabled                                                chagmaier@mmpcapital.com
EnvelopeId Stamping: Enabled                                    IP Address: 13.110.74.8
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

## Record Tracking

| Status: Original | Holder: Christopher Hagmaier | Location: DocuSign |
| 9/6/2022 10:18:36 AM | chagmaier@mmpcapital.com | |
| Status: Authoritative Copy (1 of 1 documents) | Holder: Christopher Hagmaier | Location: DocuSign |
| 9/15/2022 11:46:55 AM | chagmaier@mmpcapital.com | |
| Status: Receipt Confirmed | Holder: Christopher Hagmaier | Location: MMP Vault |
| 9/15/2022 11:47:25 AM | chagmaier@mmpcapital.com | |

## Signer Events

| Signer Events | Signature | Timestamp |
| --- | --- | --- |
| Amy Stone<br>amyloum10@gmail.com<br>Security Level: Email, Account Authentication (None) | *Amy Stone*<br>DocuSigned by:<br>6987D75BA74485...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 108.211.10.54 | Sent: 9/6/2022 10:20:05 AM<br>Resent: 9/7/2022 1:21:23 PM<br>Viewed: 9/7/2022 1:24:38 PM<br>Signed: 9/7/2022 2:21:45 PM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 9/7/2022 1:24:38 PM<br>ID: 7883172e-af6d-48b8-8297-26542b72e207 | | |
| JP Smolenski<br>jps@mmpcapital.com<br>President<br>Security Level: Email, Account Authentication (None) | *JP Smolenski*<br>DocuSigned by:<br>6755F69BD3004A2...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 107.77.223.64<br>Signed using mobile | Sent: 9/7/2022 2:21:47 PM<br>Viewed: 9/7/2022 2:26:24 PM<br>Signed: 9/7/2022 2:26:45 PM |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |
| Spiros Markopoulos<br>smarkopoulos@mmpcapital.com<br>Jr Funding Analyst<br>MMP Capital<br>Signing Group: Funding<br>Security Level: Email, Account Authentication (None) | **Completed**<br><br>Using IP Address: 96.232.204.101 | Sent: 9/7/2022 2:26:47 PM<br>Viewed: 9/15/2022 11:41:38 AM<br>Signed: 9/15/2022 11:46:53 AM |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
| --- | --- | --- |

| Editor Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Agent Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 9/6/2022 10:20:05 AM |
| Certified Delivered | Security Checked | 9/15/2022 11:41:38 AM |
| Signing Complete | Security Checked | 9/15/2022 11:46:53 AM |
| Completed | Security Checked | 9/15/2022 11:46:53 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, MMP Vault (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact MMP Vault:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: vaulting@mmpcapital.com

**To advise MMP Vault of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at vaulting@mmpcapital.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from MMP Vault**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to vaulting@mmpcapital.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with MMP Vault**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to vaulting@mmpcapital.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify MMP Vault as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by MMP Vault during the course of your relationship with MMP Vault.

# EXHIBIT "C"

This is a copy view of the Authoritative Copy held by the designated custodian

## QUALITY LEASING CO., INC. (SERVICING AGENT)
## QL TITLING TRUST LTD.

9830 Bauer Drive | Carmel, IN 46280 | 888.705.8947

Customer # 11204
Date: September 9, 2022

### BORROWER INFORMATION

Borrower Name: AIM Group, LLC dba Reve Body Sculpting

Address: 12238 Shelbyville Road, Louisville, KY 40243

Phone: 5027094492                     Email: amyloum10@gmail.com

AIM Group, LLC dba Reve Body Sculpting a Limited Liability Company organized under the laws of KY.

### CONTRACT NUMBER AND DESCRIPTION OF EQUIPMENT (Include make, model and serial number or VIN)

32456 - 2022 BTL Cellutone SN/VIN:

Equipment Location: 12238 Shelbyville Road, Louisville, KY 40243

**Term Per Contract**: 48 months from Commencement Date          **Total Monthly Payment:** $1,684.05
**Net Cost Of All Equipment Financed:** $68,470.70
**Commencement Date Per Contract:** October 1, 2022     **First Payment Date Per Contract:** October 1, 2022
**Maturity Date Per Contract:** October 1, 2026
**Total Down Payment:** $11,821.57,     **Total Interim Payment:** $0.00, **Total Security Deposit:** $0.00

AUTO PAY <u>REQUIRED</u>. A 3% fee will be added to the monthly payment if auto pay is refused/cancelled at any time.  A $35 fee will be assessed to stop or hold auto pay; five (5) days' notice required.  Unless Lender consents, failure to continue auto pay is an immediate Event of Default.  This Agreement includes all of the terms and conditions on the attached pages and terms and conditions of any supplements executed by the parties.

Additional Fees:
| | |
|---|---|
| Returned Payment Fee | $35.00 |
| Title not returned | $250.00 |
| Personal Property Tax not paid | $250.00 |
| Payment over the phone | $4.95 |
| Toll/Parking charge processing | $20.00 (Per Violation) |

**THIS AGREEMENT IS NOW ABSOLUTE, UNCONDITIONAL AND MAY NOT BE CANCELLED OR TERMINATED BY YOU FOR ANY REASON.**
By execution below, you authorize us to fill in any blanks above and to disburse the cost of the Equipment and associated costs.
Payee: BTL Industries, Inc.                                    Payee:

**This is a binding contract. It cannot be cancelled and you must pay all the Payments. Read carefully before signing and consult a lawyer if you have any questions.  You may request a copy of this Agreement in larger type. Do not sign until you receive and read it.**

Lendor:   QL Titling Trust LTD./Quality Leasing Co., INC.,          Borrower:   AIM Group, LLC dba Reve Body Sculpting
          Servicer/Administrator

                                                              By: *Amy Stone*
By: *alyssa Lawrence*                                              Amy Louise Stone
    Alyssa Lawrence

Title:   Funding Administrator                                Owner              9/12/2022 | 8:37:33 AM PDT
                                                              Title:             Date:

This Equipment Finance Agreement (this "Agreement") has been written in "Plain English".  When we use the words "you" or "your" we mean you, the Borrower, as shown above. When we use the words "we", "us" and "our" in this Agreement, we mean QL TITLING TRUST, LTD., acting through its servicer/administrator, QUALITY LEASING CO., INC., the Lender. DO NOT SIGN IF YOU DO NOT UNDERSTAND YOUR OBLIGATIONS OR LIABILITIES UNDER THIS AGREEMENT.  The undersigned person warrants on behalf of the Borrower that he/she is duly authorized to sign and bind the Borrower to the terms of this Agreement and other documents related to this Agreement. You understand that certain of your obligations under this Agreement begin before the Term commences and will be binding upon you, including the insurance requirements set forth in Section 9 below.  You acknowledge that time is of the essence with respect to your obligations under this Agreement.  IF YOU REQUEST BEFORE SIGNING, YOU WILL BE PROVIDED A COPY OF THIS AGREEMENT IN 11 POINT TYPE.

1. FOR VALUE RECEIVED, you agree to pay to the order of Quality Leasing Co., Inc., as administrator for QL Titling Trust, Ltd. all Payments set

AS

DocuSign Envelope ID: CCDE4128-3EC1-4F32-B660-1CD05FFA98F9

This is a copy view of the Authoritative Copy held by the designated custodian

forth in this Agreement and to render all performance required by this Agreement. You want us to provide financing to enable you to acquire the equipment described above ("Equipment", which term shall mean any and all items of Equipment) from the vendor or other supplier (the "Supplier") named above for the equipment cost ("Equipment Cost") as evidenced by the Supplier's invoice. For purposes of avoiding doubt as to your and our intention, we will be deemed to have advanced the Equipment Cost, and the Term commences, on the Commencement Date and will continue for the number of months set forth above. You will pay all installation and delivery costs, unless such costs are included in the Equipment Cost. You agree to pay us monthly payments of principal and interest (each, a "Payment"), in advance, for each month or any part thereof that this Agreement is in effect. Unless we agree otherwise, you will deposit the first Payment with us when you sign this Agreement. YOUR OBLIGATION TO PAY THE PAYMENTS AND OTHER AMOUNTS DUE UNDER THIS AGREEMENT IS ABSOLUTE AND UNCONDITIONAL, WILL CONTINUE IN FULL FORCE AND EFFECT REGARDLESS OF ANY DEFECT IN THE EQUIPMENT, ANY INABILITY TO USE THE EQUIPMENT OR ANY OTHER CIRCUMSTANCE WHATSOEVER AND IS NOT SUBJECT TO CANCELLATION, REDUCTION, SETOFF OR COUNTERCLAIM. If we do not receive your Payment or any other amounts owed within fifteen (15) days after its due date, there will be a late fee equal to five percent (5%) of the late amount, provided that no late charge will exceed the maximum amount permitted by applicable law. We may charge you one or more interim Payments to cover the time between the date we make payment for the Equipment and the First Payment Date calculated on a per diem basis (e.g. 1/30th of a monthly Payment). You agree that any deposit or Security Deposit will not bear interest and that we may commingle it with other funds. You agree that we may apply the Security Deposit to any amount owed to us, and if we do you agree to restore the Security Deposit to its original amount. You may request the return of the Security Deposit after your obligations under this Agreement have been met in full. You agree to allow us to adjust the Payment if the actual Equipment Cost varies from the amount we used to calculate the Payment.  For purposes of perfection of a security interest in chattel paper under the Uniform Commercial Code (the "UCC"), only the counterpart of this Agreement that bears our manually applied signature and is marked "Sole Original" by us will constitute the sole original counterpart of the original chattel paper for purposes of possession. No security interest in this Agreement can be perfected by possession of any other counterpart, each of which will be deemed a duplicate original or copy for such purposes. Notwithstanding the foregoing, as to any Agreement constituting electronic chattel paper, the authoritative copy of the Agreement will be the electronic copy in our (or our assignee's) electronic vault, and perfection of a security interest in such Agreement may only be perfected by control of such authoritative copy.

2.  **WE MAKE NO (AND HEREBY DISCLAIM ANY AND ALL) EXPRESS OR IMPLIED WARRANTIES OF ANY KIND WITH RESPECT TO THE EQUIPMENT, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.** You alone selected the Supplier and the Equipment. You asked us to pay for it.  We are not an agent of the Supplier. The Supplier is not allowed to waive or modify any term of this Agreement. The Supplier may have provided warranties for the acquisition of the Equipment. You may contact the Supplier to get a statement of those warranties from the Supplier. You will settle any dispute regarding the Equipment's performance directly with the Supplier. If any portion of the Equipment is software, you acknowledge that we do not own the software and we have no responsibilities as to it. You assign to us as security any rights you may have under any license but we assume none of your obligations. Any software that is part of the Equipment will be licensed to you by the owner with no reduction in Payments.

3.  You are responsible for all repair, maintenance and servicing of the Equipment. You agree, at your expense, to use, maintain and keep the Equipment: (a) in good operating order in the manner for which it was designed and intended; (b) SOLELY FOR YOUR BUSINESS PURPOSES and not for consumer, personal, family or household purposes; (c) in accordance with Supplier recommendations; and (d) in compliance with all applicable laws, regulations and insurance requirements.  You will obtain any permits, tags, inspections, licenses or similar items required by any such law, rule, regulation or decree. If any of the Equipment is a motor vehicle, (i) in no event will such vehicle be used for the transportation for hire of passengers or transportation of hazardous materials except with our prior written consent, (ii) you will comply and cause all persons operating such vehicles hereunder to comply with all applicable requirements of law relating to the registration, licensing, insurance, use and operation of the vehicle including operator's licensing requirements, (iii) you will pay all tolls when due; and (iv) you will comply with all conditions of the policies of insurance or any D.O.T. or other applicable law or regulation with respect to such vehicle. We or our agents may inspect the Equipment wherever located or used (and all maintenance records, repair orders, license plates, registration certificates, titles and all similar documentation) at your cost and expense.  You will at all times maintain the highest possible value and utility of such Equipment, allowing it to be used for its original intended purpose. You will not modify or alter the Equipment without our prior written consent excepting regular maintenance. All attachments, additions or replacements are automatically subject to our security interest. You will keep and use the Equipment only at the above location and will not remove the Equipment from such location or return it to us without our written consent; provided, that if the Equipment is a motor vehicle or trailer, it may be moved within the continental United States so long as it regularly returns to its designated location. You must keep the Equipment free and clear of any and all liens, encumbrances, mortgages, security interests, pledges, charges, tolls, or claims ("Liens") and will promptly, at your sole cost and expense, take such action as may be necessary or appropriate to discharge any such Lien except the respective rights of you and us under this Agreement. If we place a GPS or other tracking device on the Equipment, you will not tamper with or remove it, nor will you tamper with any odometer or other device that tracks use of the Equipment. You agree to promptly notify us in writing of any loss or damage to the Equipment. If we determine that any part of the Equipment is lost, stolen, destroyed or damaged, you will, at our option: (a) replace the same with like equipment in good repair, acceptable to us, (b) place the Equipment in good working order so that the Equipment is of the same value, utility and marketability or (c) pay to us the Casualty Value in immediately-available funds. As used herein, "Casualty Value" means the sum of (i) any accrued and unpaid Payments, other payments or performance due; plus (ii) the sum of all future Payments that would be due hereunder through the end of the Term (or if during an extended term, one year); plus (iii) any other amounts we reasonably determine necessary for us to realize the benefit of our bargain. We may require that you perform option (c) whether all or only a portion of the Equipment experiences loss or destruction and we may apportion Casualty Value for partial losses in our discretion.

4.  It will be an "Event of Default" if: you do not pay us as agreed when any amounts are due; you fail to perform any other term of this Agreement., including without limitation the payment of tolls, taxes and insurance premiums;  you sell, attempt to sell, transfer, lease, rent or otherwise transfer possession of any of the Equipment or you assign or grant any rights, title or interests in, any of the Equipment or this Agreement without our prior written consent; you or any guarantor of your obligations dies, becomes insolvent, files for or is the subject of a proceeding in bankruptcy, reorganization or any similar law or breaches or repudiates this Agreement or any guaranty of your obligations under this Agreement; your primary business, ownership or management changes; you default under any contract with us or that we deem material to your business or financial condition; or you suffer a significant adverse change in your business or financial condition or otherwise give us good reason to believe you will be unable to perform this Agreement. You agree that if an  Event of Default has occurred, we may, in our sole discretion, do any or all of the following, each of which will be construed as cumulative, and no one of them as exclusive of the others: (a) proceed by appropriate court action or actions; (b) recover interest on any unpaid Payments or other payment from the date it was due until fully paid at the rate of the lesser of eighteen percent (18%) per annum or the highest rate permitted by law; (c) without further notice to you, exercise our rights as a secured party in foreclosing on the Equipment and/or require you to

DocuSign Envelope ID: CCDE4128-3EC1-4F32-B660-1CD05FFA98F9

This is a copy view of the Authoritative Copy held by the designated custodian

deliver the Equipment to us in the condition required by this Agreement, but in any event you will remain liable as herein provided; (d) take possession of or disable any or all of the Equipment wherever situated, and for such purpose, enter upon any premises without liability for so doing; (e) sell, dispose of, hold, use or lease (in full or partial satisfaction as the case may be) the Equipment; (f) declare the Casualty Value immediately due and payable, as liquidated damages for loss of bargain and not as a penalty; and (g) exercise any other right, remedy, election or recourse provided for in this Agreement or which is available to us in law or equity. You acknowledge that an Event of Default hereunder will constitute an Event of Default under any other loan, lease or other agreement with us. Notwithstanding the foregoing or anything herein to the contrary, this Agreement will not be so cross-defaulted or cross-collateralized if held by different Lenders who are not Affiliates. The term "Affiliate" as used herein means any person or entity which directly or indirectly beneficially owns or holds ten percent (10%) or more of any class of voting stock or other interest of such person or entity or directly or indirectly controls, is controlled by, or is under common control with such person where the term "control" means the power to direct or cause the direction of the management and policies of such person or entity, whether through the ownership of voting securities, by contract, or otherwise.

5.  You own and have title to the Equipment at all times.  This is a financing and not a lease. You hereby grant us a security interest in the Equipment and all proceeds arising therefrom. If any portion of the Payments or other payments hereunder will be deemed interest and such interest exceeds the highest rate permitted by applicable law, such excess interest will be applied to your obligations to us or refunded if no obligations remain. You grant us power of attorney, and hereby authorize us (a) to file UCC financing statements and (b) list ourselves as lienholder on any certificate of title, and to take any other actions we deem necessary to protect our interest, and we may charge you a fee to cover documentation and other costs, including all fees and charges incurred in connection with the titling and registration of any titled Equipment. If we request, you will title any titled Equipment in the appropriate state and you will name QL Titling Trust, Ltd., its successors and assigns, or our designee, as lienholder as we direct.

6.  You agree to promptly pay and remit, or if we specify reimburse, and indemnify us for all sales, use, rental personal property, document or other taxes, interest, penalties, and administrative or governmental charges of any kind ("Taxes") relating to the financing, ownership, purchase or use of the Equipment, including penalties and interest, provided, upon our request, you will properly file all reports and pay all Taxes and furnish us with evidence of compliance with this section. You will be responsible for maintaining registration of the Equipment and obtaining certificates of title or ownership satisfactory to us, which you will promptly deliver to us.  This obligation to indemnify us shall continue even if this Agreement has ended.

7.  You accept all risks of loss and damage to the Equipment commencing at the time of shipment of the Equipment.  Unless the Equipment is a Vehicle, Borrower will maintain: (a) current property (including theft) insurance for the amount of Equipment value or replacement cost, whichever is higher, naming Lendor as a "Loss Payee"; and (b) at all times carry general liability insurance in amounts satisfactory to us but in no event less than $1,000,000, and if said policy includes a deductible, it shall not exceed $2,500.  If the Equipment is a Vehicle, Borrower will maintain: (a) current physical damage (comprehensive and collision) insurance for the full replacement cost or current contract balance, naming Lendor as a "Loss Payee" with a maximum deductible amount of $2,500; and (b) primary auto liability insurance in amounts not less than $1,000,000.  All such insurance policies will be in full force and effect from the time of shipment.  You hereby appoint us as your attorney-in-fact to make claims for, receive payment of, and do all acts necessary to collect the proceeds of such insurance. You will provide us with acceptable certificates or other evidence of insurance that we request. If you fail to maintain property insurance, or fail to provide us with evidence of such insurance, we may, but are not obligated to, obtain Equipment Insurance in such forms and amounts as we deem reasonable to protect our interests.  Equipment Insurance covers the Equipment and us; it does not name you as an insured or loss payee.  You agree to pay us periodic charges for Equipment Insurance, which include: premiums that may be higher than the premiums for required insurance if you maintained required insurance separately; our administrative fees; and a finance charge on any premium advances made by or on our behalf, any portion of which may generate a profit to us and our agents.  You agree that we are not a seller of insurance or in the insurance business.

8.  You may not sell, transfer, assign, lease, rent or otherwise transfer possession of the Equipment or sell, transfer, or assign any rights, title or interests in the Equipment or this Agreement without our prior written consent. We may sell or transfer our interests to another person ("Assignee"), who will then have all of our rights but none of our obligations. You agree to pay our Assignee all Payments and other amounts due hereunder without any defense, rights of offset or counterclaims, which will or could be asserted against such Assignee. You waive all defenses against such Assignee and will not hold or attempt to hold such Assignee liable for any of Lender's obligations.

9.  You agree to defend, indemnify and hold us (and our owners, officers, employees, agents, and any successors and assigns) harmless from and against: (a) all claims, demands, suits and legal proceedings arising out of or related to this Agreement or the Equipment, including: (i) the actual or alleged manufacture, purchase, financing, ownership, delivery, rejection, non-delivery, possession, use, transportation, storage, operation, maintenance, repair, return or disposition of the Equipment; (ii) patent, trademark or copyright infringement; or (iii) any alleged or actual default by you ("Actions"); and (b) any and all penalties, losses, liabilities (including the liability of you or us for negligence, tort and strict liability), damages, costs, court costs and any and all other expenses (including attorneys' fees, judgments and amounts paid in settlement), incurred incident to, arising out of, or in any way connected with any Actions, this Agreement or the Equipment. This indemnity will continue even after this Agreement has ended.

10.  You represent and warrant that neither you nor any other person who owns a controlling interest or otherwise controls you in any manner is listed on the Specially Designated Nationals and Blocked Persons Lists maintained by the Office of Foreign Assets Control ("OFAC") or other similar lists maintained by the federal government under any federal law or regulation regarding a person designated under Executive Order No. 13224 or similar lists and you are in compliance with any Bank Secrecy Act regulations and other federal regulations to prevent money laundering; (ii) you are duly organized in the state of organization set forth above; and are existing, in good standing and qualified to do business wherever necessary to carry on your present business and operations and to own its property; and (iii) this Agreement, when entered into, has been duly executed and authorized, requires no further shareholder, member, partner or other third party approval and is legal, valid, binding and enforceable against you. If requested by us, you will provide continuing periodic financial statements at intervals of not less than every year from the date hereof, which financial statements will consist of a balance sheet and a statement of earnings, such statements to be prepared in accordance with generally accepted accounting principles and you will also provide copies of annual state and federal tax returns and such other information as we may reasonably request. All such reports will be at your sole cost and expense.

11.  This Agreement and all documents executed in connection with this Agreement will be governed by the laws of the state of Indiana, including all matters of construction, validity and performance. You acknowledge that the parties have agreed to the terms of this Agreement with the understanding that any action or proceeding regarding this Agreement, the Equipment or any cause of action whatsoever arising from or related hereto will be maintained in the state or federal courts in Marion County, Indiana and you hereby submit to jurisdiction and venue, waiving any claim of improper jurisdiction or venue or *forum non conveniens*, agreeing to accept service at your place of business in any such action.  If any provision of this Agreement is invalid, the remainder of this Agreement will remain in effect. Nothing in this section will affect the right of any party to serve legal process in anys

DocuSign Envelope ID: CCDE4128-3EC1-4F32-B660-1CD05FFA98F9

This is a copy view of the Authoritative Copy held by the designated custodian

other manner permitted by law or affect the right of any party to bring any action or proceeding in the courts of any other jurisdiction. This Agreement may be executed in counterparts all of which will constitute one agreement. The exchange of signed copies by facsimile or electronic transmission will constitute effective execution and may be used in lieu of manually signed documents and qualify as authentic original signatures for purposes of enforcement thereof, including all matters of evidence and the "best evidence" rule. TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY TO THIS AGREEMENT HEREBY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING HEREUNDER OR IN ANY WAY CONNECTED WITH THIS AGREEMENT OR THE EQUIPMENT. You agree to pay our attorney's fees if we use an attorney to enforce our rights (whether or not in court).  Any notices required or permitted hereunder will be sent in writing to us or to you at the addresses set forth on the first page of this Agreement or to any other address as may be specified by a party by a notice given as provided herein and will be sent by certified mail (return receipt requested), by a nationally recognized express courier service (such as Federal Express) or personally served.  Each such notice will be deemed to be given when received upon deposit in any depository maintained by the United States Post Office, when deposited with a nationally recognized courier service or if personally served. You may not assign this Agreement, it is binding on your heirs, successors and assigns. You acknowledge we are not a "merchant" under the UCC and you have had an opportunity to review this Agreement with counsel of your choice and it will not be interpreted against us because we drafted it.  The Equipment Cost may include fees and other amounts in addition to the invoice or offered cost of the Equipment and may not be the amount payable in cash if you purchase the Equipment.  Fees may include profit and do not represent the actual cost or value of any service. This Agreement contains the entire agreement of the parties (THERE ARE NO ORAL AGREEMENTS REGARDING THE EQUIPMENT) and may not be supplemented, or amended in any way except in a writing signed by the party agreeing to such change.

**GUARANTY.** READ CAREFULLY BEFORE SIGNING AND CONSULT A LAWYER IF YOU HAVE ANY QUESTIONS.
THE UNDERSIGNED ("GUARANTOR") (1) UNCONDITIONALLY GUARANTIES THE FULL AND PROMPT PERFORMANCE AND DISCHARGE OF ALL PRESENT AND FUTURE OBLIGATIONS OWED BY THE BORROWER UNDER THIS AGREEMENT; AGREES THAT LENDER MAY EXTEND, TRANSFER AND AMEND THIS AGREEMENT AND TO BE BOUND BY ALL SUCH CHANGES; (3) WAIVES ALL NOTICES, INCLUDING NOTICES OF TRANSFER, DEMAND AND DEFAULT; AND (4) AGREES THAT LENDER MAY PROCEED AGAINST GUARANTOR DIRECTLY AND SEPARATELY FROM THE BORROWER,  EQUIPMENT, OR ANY OTHER GUARANTOR. ALL OBLIGATIONS HEREUNDER WILL BE JOINT AND SEVERAL. GUARANTOR AUTHORIZES LENDER OR ITS DESIGNEE TO USE GUARANTOR'S CONSUMER OR OTHER CREDIT REPORTS FROM TIME TO TIME IN ITS CREDIT EVALUATION AND COLLECTION PROCESSES. GUARANTOR CONSENTS TO SUIT IN THE COURTS OF THE STATE OF INDIANA, MARION COUNTY AND WAIVES TRIAL BY JURY. THIS GUARANTY WILL BE GOVERNED BY THE LAWS OF INDIANA.

**For Individual Guarantor(s)**

Guarantor  #1:
Amy Louise Stone

_DocuSigned by:_
_Amy Stone_
_038760730D974455..._

9/12/2022  |  8:37:33 AM PDT

Signature (Individually; No Titles):            Date:

DocuSign Envelope ID: CCDE4128-3EC1-4F32-B660-1CD05FFA98F9

This is a copy view of the Authoritative Copy held by the designated custodian



QUALITY LEASING CO., INC. *(SERVICING AGENT)*

# QL TITLING TRUST LTD.

9830 Bauer Drive   |   Carmel, IN 46280   |   888.705.8947

Customer # 11204

## INVOICE

Customer Name: AIM Group, LLC dba Reve Body Sculpting
              12238 Shelbyville Road
              Louisville, KY 40243

| October 1, 2022 | | | |
|---|---|---|---|
| **Contract Number and detail** | Amount | Sales tax (if applicable) | |
| **32456** Payment | $1,684.05 | Included (if applicable) | $1,684.05 |
| Interim Rent (SUBJECT TO CHANGE) | $0.00 | $0.00 | $  0.00 |
| Down Payment | $11,821.57 | $0.00 | $11,821.57 |
| Security Deposit | $0.00 | $0.00 | $  0.00 |
| | | TOTAL | $13,505.62 |

**AMOUNT DUE WILL BE DEBITED FROM ACCOUNT INFORMATION PROVIDED UPON SIGNING OF DOCUMENTS.**

DocuSign Envelope ID: CCDE4128-3EC1-4F32-B660-1CD05FFA98F9

This is a copy view of the Authoritative Copy held by the designated custodian



**QUALITY LEASING CO., INC.** *(SERVICING AGENT)*

# QL TITLING TRUST LTD.

**9830 Bauer Drive | Indianapolis, IN 46280 | 888.705.8947**

Customer # 11204

## INSURANCE AGREEMENT

Date:    September 9, 2022

Borrower Name: AIM Group, LLC dba Reve Body Sculpting
                         12238 Shelbyville Road
                         Louisville, KY 40243

To provide protection against serious financial loss should an accident or damage occur. BORROWER understands that the contract requires that the vehicle and/or equipment be continuously covered with insurance for both liability insurance and property damage insurance. <u>BORROWER shall at their expense keep the vehicle and/or equipment insured, throughout the term of this Agreement, against the hazards of all risk of loss and the full REPLACEMENT cost therof and comprehensive liability insurance for limits of **General Commercial Liability** of **not less than $1,000,000 per occurrence for both bodily injury** and **Property Damage**, with a **deductible of no more than $2,500.00.**</u>

Failure to provide such insurance gives QL Titling Trust LTD./Quality Leasing Co., Inc. the right to declare the entire unpaid balance immediately due and payable.

We have on this date financed the following Equipment/Vehicles from QL Titling Trust LTD./Quality Leasing Co., Inc.

| Contract | Quantity | Description of Equipment/Vehicle<br>Year, Make, Model Name/No., Serial No. or Other Identification |
|----------|----------|------------------------------------------------------|
| **32456** | **1** | **2022 BTL Cellutone   SN:** |

Our agent will insure this equipment listing **Quality Leasing Co, INC. ISAOA ATIMA** as **Additional Insured** and **Loss Payee**. Policies should be addressed to 9830 Bauer Drive Carmel, IN 46280.

**AIM Group, LLC dba Reve Body Sculpting**
**Borrower**



BY: _____          Owner_____
         Amy Louise Stone                                            Title

**Please email a copy of your policy to insurance@qualityleasingco.com**

DocuSign Envelope ID: CCDE4128-3EC1-4F32-B660-1CD05FFA98F9

This is a copy view of the Authoritative Copy held by the designated custodian



**QUALITY LEASING CO., INC.** (SERVICING AGENT)
# QL TITLING TRUST LTD.
9830 Bauer Drive | Carmel, IN 46280 | 888.705.8947

## Authorization for Auto Payment

I hereby authorize QL Titling Trust LTD./Quality Leasing Co., Inc. to initiate withdrawals from my bank account or charge my credit card below on a monthly basis for up to the amounts owed until my Agreement is terminated. I also agree to contact QL Titling Trust LTD./Quality Leasing Co., Inc. if there are any changes to my information.  Monthly statements will be emailed.

**Customer's Name: AIM Group, LLC dba Reve Body Sculpting          Customer # 11204**
**Contract #**
 **32456**

The monthly payment in the amount of **$1,684.05** will be deducted on day **1** of every month starting on:  **November 1, 2022**

***A 3% fee will be added to the monthly payment if auto pay is removed at any time***

Signature for Authorization _Amy Stone_
DocuSigned by:
69876D75BA74485...

---

X                              **ACH/Checking or Savings Withdrawals:**

Name on bank account: _AIM Group, LLC_          Type:    CHECKING    SAVINGS

Bank Routing #: _042100175_          (9 digits)    Account #: _145812860826_

Name of Bank: _US Bank_

**AUTO PAY WILL NOT BE HELD OR STOPPED UNLESS SUBMITTED IN WRITING AT LEAST FIVE DAYS IN ADVANCE OF PAYMENT DATE. A $35.00 fee will be charged for all NSF, returned ACH payments, stop or held payments or due date changes.

## PLEASE ATTACH IMAGE OF A VOIDED CHECK



This is a copy view of the Authoritative Copy held by the designated custodian

DocuSign Envelope ID: CCDE4128-3EC1-4F32-B660-1CD05FFA98F9



**QUALITY LEASING CO., INC.** *(SERVICING AGENT)*

# QL TITLING TRUST LTD.

9830 Bauer Drive | Carmel, IN 46280 | 888.705.8947

Customer # 11204

# Certificate of Delivery and Acceptance

Certificate dated as of September 9, 2022

Borrower:     AIM Group, LLC dba Reve Body Sculpting
              12238 Shelbyville Road
              Louisville, KY 40243

| Contract | Description of Equipment/Vehicle Year, Make, Model Name/No. | Serial No./VIN |
|---|---|---|
| 32456 | 2022 BTL Cellutone | |

If Schedule "A" attached, check here: _____

If equipment is still being manufactured initial here _____

## INSTRUCTIONS

1. Sign, date and return this certificate to lender if <u>ALL</u> the equipment has been delivered and is acceptable.

2. Do not sign unless all items are acceptable.

3. If any items are unacceptable, promptly notify lender and seller at such addresses of the specifics.

Borrower acknowledges receipt of all of the equipment and its acceptance for purposes of the equipment finance agreement and supplement(s).

Borrower acknowledges that the payments for the equipment will be based in part on the cost of the equipment.

Borrower understands that (i) based hereon lender will pay for the equipment, (ii) equipment acceptance starts borrower's irrevocable obligations under the equipment finance agreement, (iii) lender has made no express, and has disclaimed any implied, equipment warranties and (iv) borrower's obligations will not be affected by equipment characteristics, condition, defects or other problems.

Certificate of Delivery and Acceptance of Equipment:

BY:  *Amy Stone*                 Owner            Date:   9/12/2022 | 8:37:33 AM PDT
     —D9B7BD75BA744B5—
     Amy Louise Stone          Title

